Lee David HUMPHREY, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 96–235.

Supreme Court of Wyoming.

June 17, 1998.

Rehearing Denied July 14, 1998.

Sylvia L. Hackl, State Public Defender; and Donna D. Domonkos, Appellate Counsel, Cheyenne, for Appellant(Defendant).

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Kimberly A. Baker–Musick, Assistant Attorney General, Cheyenne, for Appellee(Plaintiff).

Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN and LEHMAN, JJ.

TAYLOR, Chief Justice.

Convicted on two counts for the second-degree sexual assault of his daughter, appellant claims reversible error in the admission of evidence regarding the recruitment and treatment of his concurrent "wives" and in the admission of expert testimony explaining the characteristics of charismatic leaders and followers. Finding that the district court did not err in its careful consideration of the evidentiary issues, we affirm.

## I. ISSUES

Appellant, Lee David Humphrey (Humphrey), presents the following issues for review:

*ISSUE I*

Did the trial court err when it permitted the State to use prior bad act evidence against the appellant in order to obtain a conviction?

*ISSUE II*

Did the district court [abuse] its discretion when it allowed the State to present expert testimony on charismatic leaders, their followers and the methods of control in its case in chief?

*ISSUE III*

Was it error to allow William D. Hansen to testify when his testimony was more prejudicial than probative?

*ISSUE IV*

Was it error to allow Marilyn Davis Newman to testify because her testimony was more prejudicial than probative?

*ISSUE V*

Was the appellant denied a fair trial when two witnesses were allowed to give prejudicial hearsay testimony?

The State, as appellee, responds:

Whether the district court properly allowed all testimony?

## II. FACTS

In 1975, David and Linda Humphrey were married in Davis, California. A daughter was born to the couple in 1976. Six months later, the couple moved to Louisiana. Throughout the marriage, Humphrey repeatedly attempted to recruit other women to join his "family" and apparently convinced some to temporarily reside with the couple for a period of a few weeks to a few months.

In 1977, Humphrey finalized the recruitment of his second "spiritual" wife, Sharon Flowers (Flowers). Shortly thereafter, Linda Humphrey gave birth to a second child. In 1980, Linda Humphrey gave birth to her third child, and in 1985, Flowers gave birth to her first. Continuing in his quest to expand his "family," Humphrey recruited Michele Redmon (Redmon) as his third "wife" in February 1986.

In October 1987, Redmon gave birth to a daughter, and Flowers had her second child in 1988. Although the "family" lived in the same house, the "wives" communicated only

as necessary for the functioning of the household. The family remained isolated from the community—the children were home schooled and the household members were rarely allowed to leave the home, in part because of the fear that the family arrangement would be discovered by governmental agencies and the children removed.

Humphrey trained the victim, his oldest daughter, to distrust her mother and to go to him with any problems or concerns so she would not incorporate her mother's "evil" characteristics. Humphrey began fondling the victim when she was eight or nine years old and initiated sexual intercourse when the victim was twelve or thirteen.

In 1990, the family moved to Cheyenne, Wyoming. At some point, Humphrey assigned Linda Humphrey to the role of "gatekeeper" in which she would notify the chosen "wife" to go to Humphrey's bedroom. After Humphrey moved the family to Cheyenne, he began to request that the victim, then fourteen years old, be sent to his room. Between 1990 and 1992, Redmon and Flowers gave birth to three more children. Humphrey now had nine children, three from each "wife."

In the fall of 1992, Redmon learned of the victim's ongoing sexual abuse by her father. Redmon convinced the child to tell her mother. As a result of this disclosure, the "wives" began talking with each other.

The abuse was not reported, however, and the female adults did not leave. Humphrey had informed the "wives" that the only way for them to terminate their "marriage" was death. To forestall Humphrey's advances on his daughter, the "wives" attempted to distract Humphrey when the victim was called to his room. They would go in the child's stead, make excuses for her absence, or knock on the door to divert Humphrey's attention while the victim was with him. They also planned to remove the child from the household as soon as she turned eighteen.

After moving to Cheyenne, Humphrey's temper became increasingly volatile. As time went on, the adult females' concern for their safety and that of their children grew

accordingly. By 1994, their fear of Humphrey and the concern that other children eventually would become victims had generated a secret plan to leave the home. In February 1994, while Humphrey was in Laramie, Wyoming teaching a two-day firearms class, the "wives" fled with the children.

Returning to Cheyenne to find his home abandoned, Humphrey began efforts to locate his "family," initially telling police only that Linda Humphrey and his nine children were missing and he believed they had been kidnapped by a cult. One month later, he admitted the existence of his other "wives." When his efforts to locate his family were unavailing, Humphrey initiated child custody proceedings. He was awarded temporary custody of all nine children in June and July, 1994.

From February to July, the wives lived in hiding for fear that Humphrey would find and harm them. However, when the victim learned that Humphrey had gained temporary custody of her and her siblings, she traveled to Cheyenne and informed the police that her father sexually abused her for years.

On October 11, 1994, Humphrey was charged with two counts of second-degree sexual assault. He was arrested on October 17, 1994, and released on bond the next day. In March 1995, while released on bond pending his trial on the sexual assault charge, Humphrey attempted to recruit yet another "wife." Marilyn Newman (Newman) met Humphrey when she contacted his real estate business for information on property she owned with her husband in Cheyenne. A Georgia resident, Newman began having lengthy daily telephone conversations with Humphrey through which they established a personal relationship. Eventually, Humphrey obtained a lease-purchase option on the Newmans' property and received a $6,000.00 loan from the Newmans to defend the pending criminal charges.

During her initial contact with Humphrey, Newman became "mesmerized" and agreed to participate in a ceremony which would make her his "spiritual wife." In April 1995, Newman drove to Wyoming to meet with Humphrey. When she arrived in Cheyenne, their "spiritual union" was consummated.

Newman stayed with Humphrey to help him pack and move to the leased property. While in Wyoming, Humphrey imposed upon Newman the same isolation, the same dress code, and the same form of disciplinary action to which his other "wives" had been subjected.

In May 1995, Humphrey paid a friend to accompany Newman to Georgia and instructed Newman to divorce her husband. Newman acquiesced, but on the way back to Wyoming, she stopped at a friend's house in Texas. Her friend stopped her from returning to Cheyenne and demanded Newman come to her senses and call the police. At her friend's insistence, Newman telephoned the Cheyenne police.

Prior to his scheduled trial in March 1996, Humphrey filed a series of pretrial motions, including notice that he intended to introduce testimony regarding the prior sexual conduct of the victim; a motion to exclude hearsay statements of the victim; and a motion to limit or exclude evidence of prior misconduct, including testimony regarding his lifestyle and his relationship with Newman. On November 21, 1995, the district court held a hearing on Humphrey's motion to exclude evidence, which listed twenty-five examples of "prior bad acts" alleged to be more prejudicial than probative. The district court denied the motion on all but one category, Humphrey's tax returns, finding that the remaining evidence was probative of Humphrey's use of a position of authority to cause the victim to submit to sexual intrusion.

Trial to a jury began on March 18, 1996. Throughout the trial, Humphrey claimed his innocence and asserted that the charges were nothing more than a plot by the victim and the "wives" to thwart the order granting him temporary custody of the children. Humphrey posited that if the allegations were true, the adult females or the victim would have reported the crimes earlier. The defense also attempted to characterize Newman's testimony as fabrication motivated by an unsuccessful lawsuit involving Humphrey and her real estate business, and her position as a defendant in another lawsuit filed by Humphrey regarding the Wyoming property.

Unconvinced, the jury found Humphrey guilty of two counts of second-degree sexual assault.

Following his trial, Humphrey moved for a mistrial and a judgment of acquittal based on the erroneous introduction of evidence. After a hearing on the matter, his motions were denied. He was sentenced to two consecutive terms of no less than ten and no more than twenty years at the Wyoming State Penitentiary. This timely appeal followed.

## III. STANDARD OF REVIEW

■ Decisions regarding the admission or exclusion of evidence are within the sound discretion of the trial court. *Rigler v. State,* 941 P.2d 734, 737 (Wyo.1997); *Sturgis v. State,* 932 P.2d 199, 201 (Wyo.1997). We extend appellate deference to a trial court's admission of evidence of other crimes, wrongs or acts and will not reverse the trial court " 'so long as a consistent and legitimate basis for the trial court's ruling has been articulated * * *.' " *Johnson v. State,* 936 P.2d 458, 462 (Wyo.1997) (*quoting Sturgis,* 932 P.2d at 201).

■ The discretionary range entrusted to the district court for evidentiary rulings on proposed expert testimony is set by W.R.E. 702. The rulings will remain undisturbed unless the appellant demonstrates an abuse of discretion, i.e., that the court acted in a manner which exceeded the bounds of reason under the circumstances. *Kolb v. State,* 930 P.2d 1238, 1241 (Wyo.1996); *DeWitt v. State,* 917 P.2d 1144, 1148 (Wyo.1996). In the absence of objection, we apply a plain error analysis.

"When an issue was not raised at trial, the appellant must establish that the alleged error was plain error. * * * Appellant bears the burden of establishing plain error, and the rule is applied sparingly and only in special circumstances."

* * *

"This court will find plain error when the record clearly shows the incidents alleged as plain error. Appellant must demonstrate the violation of a clear and unequivocal rule of law, that a substantial

right has been denied and that appellant was materially prejudiced."

*Fortner v. State,* 932 P.2d 1283, 1286 (Wyo. 1997) (*quoting King v. State,* 780 P.2d 943, 952 (Wyo.1989) and *James v. State,* 888 P.2d 200, 207 (Wyo.1994)); *see also Bush v. State,* 908 P.2d 963, 965 (Wyo.1995). To establish material prejudice, Humphrey must show that a more favorable verdict was reasonably possible in the absence of the error. *Fortner,* 932 P.2d at 1286; *Bush,* 908 P.2d at 965.

## IV. DISCUSSION

### A. W.R.E. 404(b) EVIDENCE

■ Prior to the presentation of evidence at trial, the district court granted the defense a continuing objection to all evidence of prior bad acts which were the subject of Humphrey's motion in limine. Humphrey now contends the district court erred in allowing the testimony of Linda Humphrey, Redmon, Flowers, and in some instances Newman, regarding: (1) death threats if they left the family; (2) the dress code imposed upon the women by Humphrey; (3) the recruitment of other women; (4) numerous sexual encounters with women in the household; (5) the family's isolation from the community; (6) Humphrey's suspicion of the government, doctors, and schools; (7) Humphrey's walking about the home in the nude; (8) Humphrey's hoarding of guns, weapons, and food; (9) sexual liaisons between Humphrey, Redmon, and the victim; and (10) testimony regarding Humphrey's fascination with David Koresh.

■ W.R.E. 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Evidence offered under W.R.E. 404(b) may be admitted only if it is offered for a proper purpose, the evidence is relevant, and the probative value is not substantially outweighed by its potential for unfair prejudice. *Vigil v. State,* 926 P.2d 351, 355 (Wyo.1996).

Humphrey claims the evidence was offered for an impermissible purpose and its potential prejudice substantially outweighed its probative value.

■ Humphrey's claim was extensively addressed in the pretrial hearing as well as at the hearing on his motion for a new trial and judgment of acquittal. The purpose for which this evidence was offered is unquestionably permissible. We have repeatedly stated that a defendant's uncharged misconduct is admissible to demonstrate a course of conduct which clarifies what happened between an accused and the victim or serves to enhance the natural development of the facts. *Sturgis,* 932 P.2d at 203; *Ross v. State,* 930 P.2d 965, 970 (Wyo.1996); *Vigil,* 926 P.2d at 358; *Daniel v. State,* 923 P.2d 728, 734 (Wyo. 1996); *James,* 888 P.2d at 204; *Brown v. State,* 817 P.2d 429, 433 (Wyo.1991); *Scadden v. State,* 732 P.2d 1036, 1044 (Wyo.1987); *Crozier v. State,* 723 P.2d 42, 49 (Wyo.1986).

The relevance of the evidence is equally patent. In this case, an essential element of the charged offenses required the State to show that Humphrey used his position of authority to cause the victim to submit. We agree with the district court that testimony illustrating the family dynamics to which this victim was subjected was clearly relevant to show Humphrey's abuse of authority.

Humphrey's claims relating to Newman's testimony are similarly without merit. The defense theory rested on the proposition that the victim and the "wives" conspired to fabricate the charges in order to defeat the temporary custody order. Newman's testimony, as a witness uninvolved with the custody dispute, was admissible to respond to the assertions of fabrication. *See Rigler,* 941 P.2d at 737–38. Her testimony corroborated unique facts, nearly identical to the experiences related by the other witnesses, which demonstrated Humphrey's methods of controlling the family members.

Humphrey's assertion that the prejudicial effect of the evidence outweighed the probative value is unpersuasive. As the district court noted, the testimony involved the direct experience of the witnesses, related to the home environment of the victim, and was offered to demonstrate an essential element of the crimes charged. Rather than abusing its discretion, we find the district court carefully and correctly determined the evidence to be admissible.

## B. ALLEGED HEARSAY

■ Humphrey asserts his conviction must be reversed due to the admission of an overwhelming amount of hearsay testimony. He claims the district court erred in allowing Linda Humphrey and Redmon to repeat the victim's disclosures about her father's sexual abuse, that it started when she was eight or nine years old, and that she was afraid of getting pregnant. Linda Humphrey also testified concerning statements made by the victim and others that they were afraid Linda Humphrey would be harmed if she attempted to interfere with the incestuous relationship. Finally, Humphrey claims error in allowing Linda Humphrey and Flowers to repeat a question asked by Flowers' five-year-old daughter as Humphrey tucked her into bed.

Although the defense sought to exclude any references to the victim's statements prior to trial, the defense did not request a continuing objection and the testimony was received without objection at trial. We therefore review these claims under a plain error standard. *Fortner,* 932 P.2d at 1286 (*quoting King,* 780 P.2d at 952).

As a general rule, hearsay evidence is not admissible except as provided by the Rules of Evidence or other law. W.R.E. 802. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." W.R.E. 801(c). A "statement" is an oral or written assertion or nonverbal conduct intended as an assertion. W.R.E. 801(a). The word "statement" means a "single declaration or remark," rather than "a report or narrative" * * *. *State v. Phillips,* 194 W.Va. 569, 461 S.E.2d 75, 91 (1995)[.]

*Kolb,* 930 P.2d at 1245.

The State argues that the testimony relating the victim's statements is not hearsay,

but falls within W.R.E. 801(d)(1)(B), which provides:

(d) *Statements which are not hearsay.*— A statement is not hearsay if:

(1) Prior Statement by Witness.—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive * * *.

At the motion in limine hearing, the State explained that it intended to call the victim as its first witness, and the remaining testimony regarding the victim's statements would be elicited to rebut the expected inference on cross-examination of recent fabrication. On that basis, the district court ruled the testimony admissible. Deviating from the representation made at the pretrial hearing, the State, without objection, called Linda Humphrey as its first witness and her challenged testimony was heard during direct examination. As a result, when heard, Linda Humphrey's testimony was technically not for the purpose of rebuttal.

However, Humphrey fails to show he was prejudiced. The defense clearly articulated its theory during opening statement. After noting that the adults in the home knew that the victim was allegedly being abused but did nothing, defense counsel concluded:

Now, we don't know, obviously it's going to be impossible to prove because you're going to hear denials, but we don't know why [the victim] alleges this. We don't know why they came forward with this. We don't know. We can surmise because there is deep suspicion about the whole timing of this thing that it was probably related to the child custody issue. We can surmise that they knew and they were gonna get him.

This theme was developed through cross-examination of Linda Humphrey, and continued through cross-examination of the State's witnesses and the defense's case-in-chief. Against this backdrop, the victim was the second witness to testify regarding her statements repeated by Linda Humphrey and Redmon. The victim's testimony was subject to vigorous cross-examination, including a strong inference she was lying. Further, the victim's statements which were reiterated by Linda Humphrey and Redmon were clearly consistent with her allegedly fabricated testimony. *See Mitchell v. State,* 865 P.2d 591, 600 (Wyo.1993); *Frenzel v. State,* 849 P.2d 741, 751 (Wyo.1993); and *Montoya v. State,* 822 P.2d 363, 368 (Wyo.1991). Consequently, Redmon's testimony falls within the ambit of W.R.E. 801 and any error in the timing of Linda Humphrey's testimony is *de minimis.*

■ Linda Humphrey's repetition of others' statements regarding their concern about her safety was hearsay, but was cumulative to evidence, properly admitted, showing the "wives" lived in fear for themselves and their children. Thus, we can say with certainty that there is no reasonable probability that, but for the admission of this testimony, the verdict would have been more favorable to Humphrey. *Kerns v. State,* 920 P.2d 632, 641 (Wyo.1996).

■ Finally, both Linda Humphrey and Flowers testified that as she was being tucked into bed by her father, Flower's five-year-old daughter asked him if he wanted, "to suck the juices" out of her vagina. Humphrey argues that this statement was impermissible hearsay which severely prejudiced his defense. However, the child's remark is not an assertion and, therefore, not hearsay. An assertion is "to say that something is so, e.g., that an event happened or that a condition existed." *Kolb,* 930 P.2d at 1246 (*quoting Armstrong v. State,* 826 P.2d 1106, 1118 (Wyo.1992)). The child's question did not assert that any event happened or that a condition existed. Instead, it was merely a reflection of a tragic desire to please. Moreover, the child's question was repeated to demonstrate the "wives'" increasing anxiety about the safety of the children and the impetus for their escape. Since the relevancy of the child's question was derived from the mere fact that it was asked, it was not hearsay and did not violate a clear rule of law. *Johnson,* 936 P.2d at 466.

## C. EXPERT TESTIMONY

 Humphrey claims he did not receive a fair trial because the State was allowed to present expert testimony on charismatic leaders that was more prejudicial than probative. Again, Humphrey failed to object to this testimony at trial, and therefore plain error must be established to warrant reversal.

Dr. William Hansen, a psychologist, testified as to the general characteristics of charismatic leaders and their followers. Prior to his testimony, Humphrey objected to that portion of Dr. Hansen's proposed testimony which would connect the events of this case to those characteristics. The district court granted Humphrey's motion to exclude that portion of the testimony, but allowed Dr. Hansen to testify in general terms in order to assist the trier of fact in its understanding of the behavior commonly associated with charismatic leaders, the methods utilized to maintain control, and the often mystifying behavior of their followers.

Humphrey does not challenge Dr. Hansen's qualifications as an expert, but claims the district court erred because the prejudicial effect of the testimony far outweighed its probative value. In a somewhat tenuously reasoned argument, Humphrey claims the testimony had no relevance because it related only to the behavior of the adult women in the household, not the victim. Humphrey extrapolates in his appellate brief that Dr. Hansen's testimony was used solely to bolster the credibility of the "wives:"

> Even though the witness was not allowed to issue an ultimate opinion on whether the Appellant was a charismatic leader and the adult women [were] followers, the inference was there, and is specifically what the trial court said the jury could do with this evidence, i.e. draw the conclusion. The only reason the trier of fact needed to draw this conclusion was to further conclude that if the adult women did display characteristics of followers and the Appellant characteristics of a charismatic leader, then the women must be telling the truth. This is improper vouching for the credibility of another witness.

Humphrey's argument rests on several faulty premises. We see no reason why the general testimony concerning the characteristics of leaders and followers related solely to the "wives" and not to the experiences of the victim. Secondly, pursuant to the ruling of the district court, Dr. Hansen's testimony explained only behavior which would, under normal circumstances, be confounding to a layman. His testimony explained that a charismatic leader seeks control of his *entire* following, and that the means of control results in behavior which appears startling in other contexts.

 The admissibility of expert psychological testimony is a function of its ability to help the jury understand how particular conduct can be viewed as part of a greater pattern of behavior. *Kolb,* 930 P.2d at 1242. Testimony which may help the jury in understanding another aspect of the case is admissible even though it incidentally supports another witness's credibility. *Rigler,* 941 P.2d at 739; *Curl v. State,* 898 P.2d 369, 374 (Wyo.1995).

In *Rivera v. State,* 840 P.2d 933, 939 (Wyo. 1992), we held that a clinical psychologist, testifying as an expert, did not impermissibly vouch for the credibility of the witness when he discussed the general symptoms of rape victims. We also have held that expert testimony explaining the behavioral characteristics of adolescent victims of sexual assault may assist the jury in understanding behavior inconsistent with a victim's claims of assault. *Frenzel,* 849 P.2d at 747; *Griego v. State,* 761 P.2d 973, 979 (Wyo.1988). Dr. Hansen's testimony is similar. He did not directly vouch for any witness's credibility nor did he state the victim had been sexually abused. Rather, his testimony explained the dynamics of a household in which one member exacted complete control of the others, a situation relevant to the victim's circumstances. The testimony further assisted the jury in understanding the victim's behavior in remaining in the household and her failure to seek assistance from the community when the other "parents" acquiesced to her victimization. As limited by the district court, this testimony did not unfairly prejudice Humphrey. Again, the district court astutely

weighed the relevance of this evidence against the potential for prejudice. We see no abuse of discretion in the admission of this evidence.

## V. CONCLUSION

The district court did not abuse its discretion in the admission of evidence. Humphrey raises no issues which merit reversal of his conviction. Therefore, we affirm.