2003 WY 93

Dannie L. WILDE, Jr., Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 01–180.

Supreme Court of Wyoming.

Aug. 13, 2003.

Kenneth M. Koski, Public Defender; Donna D. Domonkos, Appellate Counsel; and Tina N. Kerin, Senior Assistant Appellate Counsel, Representing Appellant. Argument presented by Ms. Kerin.

Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Georgia L. Tibbetts, Senior Assistant Attorney General, Representing Appellee. Argument presented by Ms. Tibbetts.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE and VOIGT, JJ.

1. Wyo. Stat. Ann. § 6–2–302 (LexisNexis 2003) provides:

§ 6–2–302. **Sexual assault in the first degree.**
(a) Any actor who inflicts sexual intrusion on a victim commits a sexual assault in the first degree if:
(i) The actor causes submission of the victim through the actual application, reasonably calculated to cause submission of the victim, of physical force or forcible confinement;
(ii) The actor causes submission of the victim by threat of death, serious bodily inju-

HILL, Chief Justice.

[¶ 1] Appellant, Dannie L. Wilde, Jr. (Wilde), contends that the State and the district court committed a series of errors during his trial, which are so serious that his conviction for first-degree sexual assault[1] must be reversed. Wilde contends: The trial court erred in determining that the child witnesses were competent and that their testimony was not "tainted;" the district court allowed the admission of multiple, hearsay repetitions of the victim's story; witnesses were allowed to vouch for the credibility of the victim; the district court allowed the admission of irrelevant and prejudicial "lifestyle" evidence; the prosecutor engaged in misconduct by violating the district court's liminal order; the district court committed reversible error by commenting to the jury about the effect testifying had on the victim; and, finally, that in combination those errors amount to cumulative error requiring reversal.

[¶ 2] We conclude that there were errors in the proceedings below of such significance that reversal of Wilde's conviction is required. Thus, the judgment and sentence of the district court will be reversed and the case remanded to the district court for a new trial.

### ISSUES

[¶ 3] Wilde raises these issues:

I.   Did the trial court err in allowing the repetition of the alleged victim's story through hearsay testimony?

II.   Did the trial court err in its determination that the child witnesses were competent and "untainted?"

ry, extreme physical pain or kidnapping to be inflicted on anyone and the victim reasonably believes that the actor has the present ability to execute these threats;
(iii) The victim is physically helpless, and the actor knows or reasonably should know that the victim is physically helpless and that the victim has not consented; or
(iv) The actor knows or reasonably should know that the victim through a mental illness, mental deficiency or developmental disability is incapable of appraising the nature of the victim's conduct. [Emphasis added.]

III. Did the trial court err in allowing irrelevant, prejudicial information concerning [Wilde's] lifestyle?

IV. Was the testimony of the alleged victim improperly bolstered and vouched for by the testimony of Dr. Tubach (a pediatrician), Ms. Huyler (a "forensic interviewer") and the alleged victim's mother?

V. Did the prosecutor commit misconduct by violating the liminal order, in closing argument and at sentencing?

VI. Did the trial court commit reversible error when it commented, in the presence of the jury, what the effect of testifying was upon the alleged victim, as it improperly interjected judicial bias into the trial and expressed an opinion that the trial court believed the alleged victim's testimony?

VII. Does cumulative error mandate a new trial for [Wilde]?

The State rephrases and reorders the issues as follows:

I. Did the district court err in concluding that the child victim and her sister were competent to testify at trial?

II. Was [Wilde] denied a fair trial by the district court's evidentiary rulings?

III. Did the testimony of three witnesses impermissibly vouch for the credibility of the victim, necessitating reversal of [Wilde's] conviction?

IV. Did the prosecutor's conduct during trial and at sentencing constitute prosecutorial misconduct?

V. Did the district court commit reversible error by its comment during the testimony of the child victim?

VI. Was [Wilde] denied a fair trial due to the cumulative effects of the alleged errors occurring at trial?

## FACTS

[¶ 4] The nature of the issues raised requires us to set out the details of the evidence pertinent to those issues as we address them individually. For purposes of background and context, we will set out the two competing theories presented to the jury for resolution. The victim, AM, testified that Wilde lured her into his bedroom to watch him perform a body piercing. AM assumed at the time that Wilde was going to pierce his tongue. Once in the bedroom, Wilde actually exposed himself to AM and pierced his genitals by inserting a "barbell" type piece of jewelry into his scrotum, just below the penis. Wilde admitted to doing this piercing in front of AM, but testified that the events of that day then ended.

[¶ 5] AM's testimony continued, averring that Wilde showed her a pistol he kept in his dresser drawer (and that eventually he threatened her with the pistol, telling AM she had better not tell what was happening), sat on top of her, pulled her pants down and attempted, unsuccessfully, to pierce her labium, and then proceeded to forcibly rape her. AM testified that during the course of the sexual assault, her genitalia were injured by pieces of jewelry that were attached to Wilde's genitalia. These events were alleged to have occurred on or about March 15, 2000.

## DISCUSSION

### Competency of Victim and Her Sister

[¶ 6] Wilde called into question the competency of AM, as well as her sister AN. Both of these child witnesses (ages 12 and 7 at the time of trial, and 11 and 6 at the time of the alleged assault) admitted to telling false stories of sexual misconduct by their mother's husband and boyfriend. The victim did not report the incident to her mother until two months after it allegedly occurred. Thereafter, the victim talked with a number of investigators, health care professionals, and a social work professional, relating the same story that she told to her mother. Wilde contended that the victim and her sister were not reliable witnesses because of the false accusations they had made in the past, and because their mother was motivated to influence their testimony about Wilde. It could be inferred that a note she left for him was an attempt to use this situation to extort a pickup truck from Wilde. This occurred before she took her daughter to report to the authorities. According to mother, AM delivered her revelations in installments, with each installment including ever more serious allegations, in response to mother's

ever more insistent demands that AM tell the whole truth. In addition, Wilde contended that the victim's testimony may have been "tainted" by the many interviews to which she was subjected prior to trial.

[¶ 7] The standard of review applicable to a competency hearing is clearly established:

> We have held that when a child is called into the courtroom to testify, and the child's competency is called into question by either party, it is the duty of the trial court to make an independent examination of the child to determine competency, and that determination will not be disturbed unless shown to be clearly erroneous. *English v. State*, 982 P.2d 139, 145 (Wyo. 1999). In *English*, we also held that an assertion that a child's testimony was tainted could best be comprehended as a part of the competency hearing and that a separate taint hearing is not required. 982 P.2d at 146. In *English*, we established that the requirement that a competency hearing on the issue of "taint," based on an assertion that the child's statements were the product of suggestive or coercive interview techniques, or some other potentially improper influence, is triggered whenever a party presents the court with "some evidence" that a child witness is incompetent. 982 P.2d at 146–47; *Ryan v. State*, 988 P.2d 46, 58 (Wyo.1999).

*Alicea v. State*, 13 P.3d 693, 697 (Wyo.2000) (footnote omitted); *also see Billingsley v. State*, 2003 WY 61, ¶¶ 9–10, 69 P.3d 390, ¶¶ 9–10 (Wyo.2003).

[¶ 8] In this case, a competency hearing was conducted by the district court in accordance with the decisions cited above. At the conclusion of that hearing, the district court determined that both the victim and her sister were competent to testify. As noted above, we will not overturn a trial court's determination that a witness is competent to testify unless that determination is clearly erroneous. Our review of the record does not suggest that the trial court's rulings were clearly erroneous.

[¶ 9] We do not question in any way the trial court's decision that the victim was competent to testify. However, we do have some reservations as to whether the victim's sister was competent to testify to the very limited relevant information she was able to relate. AN testified that she looked into Wilde's bedroom during the time that AM claimed to have been being raped. AN said she was not able to see much, but perceived that AM and Wilde were "wrestling." This testimony, of course, served a very important role in corroborating the victim's testimony. The prosecutor's questioning of AN was largely leading and AN answered those questions fairly well. However, when it came to the gravamen of the competency decision the district court had to make, AN faltered seriously. After relating that she was only able to open the bedroom door a crack, her testimony continued:

> Q. So what happened when you opened the door a crack? What did you see?
>
> A. I saw [AM] laying on the bed, and Dannie sitting at the bottom of her feet, and he was trying to take off her pants.
>
> Q. What did you think they were doing?
>
> A. Wrestling.
>
> Q. What did you do?
>
> A. I walked back out there [to the living room], and sat down and watched the movie.
>
> Q. When did you first tell somebody what you had seen that day?
>
> A. When [AM] told me what he did.
>
> Q. Did your mom ask you if you knew what happened?
>
> A. Yeah, when I saw them playing in the clubhouse.
>
> Q. Who else was there when your mom asked you that?
>
> A. [AM] and me and Paul.
>
> Q. Did you tell everybody, or did your mom take you somewhere else?
>
> A. Took me somewhere else.
>
> Q. Did you tell your mom what you saw when she took you somewhere else?
>
> A. Yes.
>
> Q. Where did you go.
>
> A. To the school that I went to when I was in kindergarten.

Q. Was that close to your house?

A. Yeah.

Q. Do you recall what kind of questions your mom asked you about this?

A. Yeah.

Q. What?

A. What happened. I forgot.

Q. Did she already know what you had seen?

A. What?

Q. Did she already know what you had seen?

A. Not yet, until I told her, she only knew.

Q. Did she tell you to say anything?

A. No.

Q. Are you telling us the truth today?

A. Yes.

The cross-examination, for which AN was not able to prepare, produced a significantly different result:

Q. Has your sister [AM] ever asked you to lie before?

A. No.

Q. Ever in your whole life?

A. Only once.

Q. When was that?

A. When we were—when my mom went to work, she needed someone to baby-sit us.

Q. And what did [AM] lie about, or what did [AM] tell you to lie about?

A. About Paul smacking my mom.

Q. About Paul smacking your mom?

A. Yes.

Q. Is that what she told you?

A. Yes.

Q. Was that a lie?

A. Yes.

Q. Why was that a lie?

A. Because that never even happened.

Q. And so did you lie because [AM] asked you to?

A. Yes, because we really needed a baby-sitter.

Q. Because you what?

A. Because we really needed a baby-sitter at this time.

Q. Barely needed a baby-sitter at this time?

A. If we really—

Q. You really needed a baby-sitter at this time?

A. Yes.

Q. By someone besides Paul?

A. Yeah.

Q. So you wanted a different baby-sitter?

A. Yes.

Q. Why did you want a different baby-sitter?

A. Because my mom didn't feel comfortable with us girls staying with a boy.

Q. With Paul being a boy?

A. Yeah.

Q. Do you know why she didn't feel comfortable with you and [AM] staying with Paul?

A. Because she kind of doesn't like boys being around young people.

Q. Do you still live with Paul?

A. Yes.

Q. Is that still a problem?

A. Yes.

Q. Why is it still a problem?

A. Because they fight a lot, and Paul keeps breaking my mom's heart by saying mean stuff, by saying "I hate your guts."

Q. How do you know that her heart is broken?

A. Because she tells us every bedtime to not worry, and she says what happened.

Q. Did you and [AM] talk about coming to court—

A. No.

Q. —today?

A. Yeah.

Q. What did you talk about?

A. About I'm scared of Dannie. We kept on saying, "I'm really scared of Dannie."

Q. [AM] said that?

A. Yeah.

Q. Did you say that?

A. Yeah.

Q. Why did you say that?

A. Because I am scared of Dannie.

Q. Why?

A. Because what he did to my sister.

Q. You didn't see him do anything to your sister; is that right?

A. I only saw him pulling down her pants. That's the only part I saw.

Q. And you thought they were wrestling?

A. Yes.

Q. Do they usually pull down pants to wrestle?

A. No.

Q. Why did you think it was wrestling?

A. Because I didn't see that at first. I just thought—

Q. You didn't see what at first?

A. Dannie pulling down my sister's pants.

Q. How long were you watching?

A. I only watched for a second, and then I closed the door and went.

Q. So when did you find out that he pulled down her pants?

A. When I saw it.

Q. During that second.

A. Yes.

Q. So there was a second that had wrestling and pulling down pants in it?

A. No. I only saw pulling down pants.

Q. So when did you see wrestling?

A. I didn't. I thought they were wrestling.

Q. Do you like to wrestle?

A. I can't remember.

Q. Did you hear anything in the bedroom while you were outside the bedroom?

A. No.

Q. [But] you told me that [AM] told you to lie about Paul—

A. Yes.

Q. —right?

A. Yes.

Q. [AM] told you to lie about anything else?

A. I don't know because I'm losing my memories because I don't really know about the normal life. All I really know about is what

Q. You don't know about normal life?

A. Not yet. I don't usually know about normal life unless I'm in the normal life.

Q. What is normal life?

A. It's where you go outside and play, run around, you eat dinner at night, you have breakfast in the morning, have lunch in the afternoon.

Q. What's different from normal life?

A. Getting—

Q. What's the opposite of normal life?

A. I don't know.

Q. Do you know what opposites are?

A. Yeah.

Q. What's the opposite of hot?

A. Cold.

Q. What's the opposite of normal life? What would be things you would be—that would be different and opposite from normal life?

A. Getting hurt.

Q. Are things that happen not in normal life true or not true?

A. I don't know that question because I can't—I didn't hear you.

Q. If something happens, and it's not normal life, the thing that happened, is it real or is it not real?

A. Not real.

Q. So things that don't happen in normal life aren't real, they're make believe?

A. No.

Q. What are they?

A. They can be real; they can be not real.

Q. What happened to your sister, was that normal life, was that real, was that not real, what was that?

A. It was real.

Q. And how do you know that?

A. Because—because I know real, and I know not real.

Q. How do you know that that was real?

A. Because I see it in real life, and I didn't see in not real life.

Q. Do you sometimes see things in not in real life?

A. Yeah.

Q. Like what?

A. Like dinosaurs, like me playing with the dinosaurs, kind of.

Q. Now, I asked you about times [AM] has asked you to lie.

A. Yes.

Q. Now, I want you to tell me other times that you've just lied.

A. When I hit my sister, I said I didn't.

Q. Any other times?

A. When I—when I said that I don't like my sister, and [AM] went to go tell. I said I didn't like my sister. I said that [AM] said that.

Q. Have you ever lied about anyone touching you?

A. Yes.

Q. What did you lie about?

A. My dad.

Q. Who's your dad?

A. [J]

Q. What did you say about [J]?

A. Touching me in a appropriate [*sic*] way with a spoon.

Q. Well, what way did he touch you?

A. Like in a spot where girls have to not show.

Q. In the front part or the back part?

A. Front.

Q. Like, where you pee?

A. Yeah.

Q. He touched you with a spoon, you said?

A. Yes.

Q. What did he do with the spoon?

A. He touched me where I go pee at.

Q. How long did he touch you for?

A. Like, one second.

Q. And did you lie about that?

A. Yes.

Q. Did he touch you?

A. No.

Q. Why did you lie about that?

Q. Because—because sometimes I never even lie, because then again, I really want to lie, so I do.

[¶ 10]   Given that the essence of this case was the credibility of AM, vis-à-vis the credibility of Wilde, AN's testimony revealed a child whose truthfulness could be viewed as questionable, and who may have been coached (or who is "suggestible"), particularly with respect to the "one second" that is critical. It is these concerns that inform our reservations.

### Repetition of Hearsay Versions of Victim's Account

[¶ 11]   We will begin our consideration of this issue by noting that the defense attorney made numerous and continuing objections to the admission of the series of hearsay statements. AM was the first witness called by the State, and she related her version of the events of March 15, 2000, in detail. AM's mother, Officer Schluck, Dr. Tubach, an emergency room nurse, and Lynn Huyler were then called as witnesses and they repeated all, or at least parts of, the allegations made by AM. Wilde contends that all of this testimony was inadmissible because it is hearsay for which there is no exception in the rules. W.R.E. 802 provides:

Hearsay is not admissible except as provided by these rules or by other rules adopted by the Supreme Court of Wyoming or by statute.

W.R.E. 801(d)(1)(B) provides:

The following definitions apply under this article:

(a) Statement. A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion.

(b) Declarant. A "declarant" is a person who makes a statement.

(c) Hearsay. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

**(d) Statements which are not hearsay. A statement is not hearsay if—**

(1) **Prior Statement by Witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A)** inconsistent with his testimony, and, if offered in a criminal proceeding, was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or **(B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive,** or (C) one of identification of a person made after perceiving him[.]  [Emphasis added.]

[¶ 12]  The issue in the instant case is different from many of the other cases we have considered with respect to this issue. Here, Wilde contends that AM fabricated at least part of her story, and that she told the same fabricated story to her mother, sister, police officer, physician, nurse, and "forensic interviewer." Each of those witnesses then repeated AM's "consistent" story without much variation. Thus, the circumstances presented here are more in the nature of several, more-or-less contemporaneous repetitions of a single statement, rather than *prior* consistent statements followed by a report to authorities of a complete statement. For instance, this is not a case like *Alicea* where the victim told parts of the story to other persons, prior to making her report to authority figures. *Alicea,* 13 P.3d at 698–99. In *Frenzel v. State,* 849 P.2d 741 (Wyo.1993) we said:

> A prior consistent statement may be used as substantive evidence if the alleged improper influence arose after the statement was made. *Montoya,* 822 P.2d at 367 (citing *Stephens v. State,* 774 P.2d 60, 71 (Wyo.1989)).  However, if the prior consistent statement was made after the improper influence arose, then the statement may only be used for rehabilitative purposes. *Id.* When a prior consistent statement is admissible only for rehabilitative purposes, a limiting instruction must be given, but only if requested. *Id.*

*Frenzel,* at 751; *Stephens v. State,* 774 P.2d 60, 72 (Wyo.1989); also see generally Debra T. Landis, Annotation, *Admissibility of Im-* *peached Witness' Prior Consistent Statement—Modern State Criminal Cases,* 58 A.L.R.4th 1014 (1987 and Supp.2001); and Jean F. Rydstrom, Annotation, *Effect of Rule 801(d)(1)(B) of the Federal Rules of Evidence Upon the Admissibility of a Witness' Prior Consistent Statement,* 47 A.L.R.Fed. 639 (1980 and Supp.2001).  We do not include *Cook v. State,* 7 P.3d 53, 57–58 (Wyo.2000) in our analysis because we are not called upon to review these errors under the plain error doctrine.

[¶ 13]  In this instance, the testimony at issue was admitted in the State's case-in-chief and in the face of defense counsel's very clear objections.  We have repeatedly articulated the standard of review for evidentiary rulings.  Evidentiary rulings are within the sound discretion of the trial court and include determinations of the adequacy of foundation and relevancy, competency, materiality, and remoteness of the evidence.  This Court will generally accede to the trial court's determination of the admissibility of evidence unless that court clearly abused its discretion.  We have described the standard of an abuse of discretion as reaching the question of the reasonableness of the trial court's choice.  Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria.  It also means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.  In the absence of an abuse of discretion, we will not disturb the trial court's determination.  The burden is on the defendant to establish such abuse. *Willis v. State,* 2002 WY 79, ¶ 16, 46 P.3d 890, ¶ 16 (Wyo.2002).

[¶ 14]  We hold that the district court abused its discretion in admitting this hearsay testimony during the State's case-in-chief, and furthermore, given the repetitive nature of the evidence so admitted and its highly prejudicial character, that it was reversible error under the circumstances of this case.  4 Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence, § 405 (2nd ed.1994 and Supp.2002) ("And testifying by itself does not pave the way even for prior consistent statements, for the ex-

ception is not intended simply to enable the parties to bolster testimony by their witnesses by piling on their prior statements."); and see *United States v. Check*, 582 F.2d 668, 681 (2nd Cir.1978) ("To repeat, aside from the relatively small number of prior statements that are admissible as being within the dispensation conferred by Fed.R.Evid. 801(d)(1)(B), a witness's prior statements offered to prove the truth of the matters asserted therein are not immunized from the proscriptive effect of the hearsay rule.").

**Admission of Evidence Vouching for the Victim's Credibility**

[¶ 15] The same evidence that gave rise to the hearsay objections we discussed above also gave rise to Wilde's contention that the district court erroneously admitted evidence that primarily, or at least substantially, was used for the purpose of the witness vouching for the victim's credibility. In *Ogden v. State* 2001 WY 109, 34 P.3d 271 (Wyo.2001) we held:

Testimony that is otherwise admissible will not be excluded unless it constitutes an actual conclusion about the guilt or innocence of the accused party. *Saldana v. State*, 846 P.2d 604, 616 (Wyo.1993). "An interpretation of the evidence by a witness, even though that interpretation may be important in establishing an element of the crime and thus leading to the inference of guilt, is not in the same category as an actual conclusional statement on the guilt or innocence of the accused party." 846 P.2d at 616.

*Ogden*, ¶ 23. While we did not find the vouching in *Ogden* to be reversible error, we were only able to reach that conclusion because the vouching in that case did not rise to the level we have previously held to be reversible error. *See Whiteplume v. State*, 841 P.2d 1332, 1344 (Wyo.1992); *Stephens v. State*, 774 P.2d 60 (Wyo.1989); and *also see Davis v. State*, 2002 WY 88, ¶ 18, n. 4, 47 P.3d 981, ¶ 18, n. 4 (Wyo.2002).

[¶ 16] At the outset of trial, the district court granted a motion in limine prohibiting the State from asking witnesses to vouch for the credibility of the victim. In this case, the victim's mother was asked "did she believe" her daughter when she related that Wilde had pierced his scrotum in front of AM, and mother answered that she did. Mother also related in her testimony that AM had lied to her before so she wanted to make sure that AM was telling the truth. Defense counsel did not raise specific objections as these errors occurred (although the district court had acknowledged a continuing objection to such testimony). However, the district court did note them by admonishing the jury:

Ladies and gentlemen, before Mr. Serelson begins, I want to go back to a spot where the present witness testified that when [AM] told her what happened, she believed it.

Please remember that it is exclusively your function to decide what testimony to believe. The belief or opinion of another person and who's telling the truth, or whether what they say is accurate is an intrusion in your function. You are the exclusive judges of who to believe, who's telling the truth.

So to the extent any witness offers any opinion or belief about the truthfulness of another witness, you must disregard that, and decide yourselves what testimony you believe, what testimony you don't.

[¶ 17] Pediatrician Shana Tubach, M.D., also interviewed AM. In her testimony she emphasized that AM knew why she was being examined and wanted to go through with the exam because "she wanted the man that had hurt her to be put away." She also related, over repeated objections, the details told to her by AM, and that AM did not report for over two months because "she'd been very scared since that time, that she tried to never leave the house unless she needed to; that if she walked in front of a window, that she would get down and hide so nobody could see her." The district court sustained an objection to the above quoted testimony. Dr. Tubach also emphasized that a determination of whether or not sexual abuse had actually occurred was important to her in determining whether or not counseling was needed, leaving a distinct impression that she credited AM's story.

[¶ 18] Lynn Huylar, a social worker at a child advocacy center, also interviewed AM

and espoused an expertise in forensic examination of children who are alleged to have been sexually abused. In her testimony she emphasized that a part of her interview process is to determine if the child knows what telling the truth is and whether the child is suggestible. When Huylar was asked by the prosecutor if AM was able to provide a detailed account of the event at issue, Huylar answered that "kids who have been sexually abused will be able to provide those [details]." Defense counsel objected and the objection was sustained. Yet again, only two pages later in the transcript, the prosecutor elicited an answer from Huylar to the effect that she gave much weight to the details AM provided, because a child cannot make up that sort of detail. Defense counsel objected, and the objection was sustained. Nonetheless, the prosecutor continued to pursue that line of questioning:

Q. Are you always assessing whether or not a child has a reason to be making something up?

A. Yes.

Q. And did you make an assessment in your interview of AM?

A. I did, and that assessment was she shared with me that—she said—she quoted that she wouldn't lie about this guy because she thought "he was pretty cool, and he helped my mom out, and he took us places."

Q. Whenever you're conducting a forensic interview, does part of the protocol require that you entertain the concept of an alternative hypothesis?

A. Yes, it is.

Q. And what kind of alternatives do you look for?

A. Oh, benign activities that would have been misinterpreted, a bathing activity, a normal kind of an activity that a child just misinterpreted.

Q. Did you make an assessment of that in this case?

A. I did, and I was unable to rule out any other alternative explanation that would have—

MR. SERELSON: Objection.

COURT: Sustained.

Huylar also testified that she did the same sort of assessment with AM's little sister, and it can fairly be presumed that the jury might well have concluded that Huyler also would have concluded that she, too, was telling the truth. Despite further admonitions from the trial court, the prosecutor repeated her efforts to have this witness vouch for the credibility of AM during her redirect examination of Huylar.

[¶ 19] Our assessment of the above-described testimony is that it does constitute reversible error, especially given the difficult credibility issues the jury had to assess in this case. The defense objected to virtually every erroneous question, and the district court did its level best to keep the prosecutor on track. However, despite several warnings, admonitions, and sustained objections, the prosecutor continued down the path of reversible error.

## Admission of Prejudicial "Lifestyle" Evidence

[¶ 20] Wilde claims that the district court erred in allowing the admission of prejudicial evidence that was used to portray Wilde as following a perverted lifestyle, and that such evidence was not relevant to any issue in this case. We agree that this evidence was admitted, in error, and we also reverse on this basis.

[¶ 21] It must be recognized that "lifestyle" evidence is nothing more than character evidence and its admission or exclusion is governed by W.R.E. 404, and it is that rule which circumscribes our analysis of the issue raised by Wilde in this regard:

**Rule 404. Character evidence not admissible to prove conduct; exceptions; other crimes.**

(a) Character evidence generally. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) Character of Accused. Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

(2) Character of Victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

(3) Character of Witness. Evidence of the character of a witness, as provided in Rules 607, 608, and 609.

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[¶ 22] "The prosecutor may not be the first party to introduce character evidence; that decision is entirely in the hands of the defendant." 3 Clifford S. Fishman, *Jones on Evidence Civil and Criminal*, § 16:10 (7th ed.1998). Fishman continues, "Where evidence is relevant on a significant issue on a theory other than as evidence of defendant's character, on the other hand, admission depends upon its probative value on the non-character issue assessed against the risk of unfair prejudice regarding defendant's character." A jury cannot be allowed to convict a defendant for bad character or for any particular "disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." *State v. Bordis*, 905 S.W.2d 214, 232 (Tenn.Cr.App. 1995) (citing cases). Paraphrasing further from that case, Wilde's culpable intention under the circumstances at issue in this case should have been the focus of the trial, not the inflammatory exposé of the manner in which he had conducted his life.

[¶ 23] As a preface to further discussion of this issue, we also note that Wilde had no felony criminal record, and the State was prohibited from using any criminal record in its case-in-chief. In addition, the State had agreed that it would not use evidence concerning "sex toys and paraphernalia" that were seized in a search of Wilde's home.

The district court reserved ruling on whether it would permit the introduction of evidence that Wilde had exposed himself to adult women for the purpose of exhibiting his tattoos and body piercings. The district court also reserved ruling on whether items of pornography would be admissible during the trial.

[¶ 24] Specifically, Wilde asserts that his right to a fair trial was prejudiced by the introduction of a considerable volume of such character or "lifestyle" evidence. The evidence in this case included several photographs of Wilde's groin, penis, scrotum, and anus. The photographs reveal that he has many piercings to those areas of his anatomy, as well as many tattoos. We question whether even one such photograph was probative in this case (and certainly whether its probative value was outweighed by its prejudicial effect), but certainly more than one was too many. Wilde did not deny that he had such piercings and tattoos and there was no issue about his identity as the alleged perpetrator of the crime at issue. In defiance of the motion in limine and other rulings by the district court, as well as objections by defense counsel (some of which were overruled), the State elicited testimony from various witnesses so as to reveal to the jury that the State found Wilde to be in possession of sexual cartoons, sexually explicit photographs, photographs of pierced female genitalia, a wooden paddle, some motorcycle goggles, a set of fur-lined handcuffs, two containers containing Kama Sutra Oil of Love, some vanilla cream, some raspberry kiss cream, a black leather whipping strap, black nylon eye cover mask, pornographic material, men's and women's underwear, and sex toys. The district court also permitted one adult female witness to testify, in vivid detail, that Wilde had exposed himself to her in the process of showing his tattoos and body piercings.

[¶ 25] We conclude that this sort of inadmissible, and/or irrelevant, and/or excessively prejudicial "lifestyle"/character evidence so permeated the trial as to be reversible error.

**Other Issues**

[¶ 26] Because we reverse on the grounds more fully set out above, we

devote only passing attention to the other issues raised by Wilde. Wilde also contends that the prosecutor violated the trial court's liminal order during trial, in closing argument, and at sentencing, and those acts constitute prosecutorial misconduct. We have already concluded that the prosecutor committed errors that require reversal, and we will not replow that ground. Wilde contends that the prosecutor exhorted the jury to find Wilde guilty "for [AM]." While exhortations for a jury to do its duty, which suggest that the only proper way for the jury to do its duty is to find the defendant guilty, are improper, we do not view this isolated instance as an independent ground for reversal, although such exhortations are certainly discouraged. In addition, Wilde calls to our attention that at sentencing the prosecutor announced that she had "two crates" of "child pornography" in her office and that the pornographic material proved Wilde was "an opportunistic pedophile." The defense countered that it had examined all of the evidence the prosecution claimed that it had in the "two crates" and that none of it was child pornography. Moreover, Wilde claims there was no evidence presented to the trial court to establish that he was "an opportunistic pedophile."

[¶ 27] For purposes of advancing ethical practices by prosecutors, we will simply add here that it is misconduct to deliberately ignore a trial court's liminal orders, to deliberately ignore a trial court's admonitions and the sustaining of defense objections, to argue evidence that has not been admitted in the proceedings whether that is done at trial or at sentencing, and to attempt to convict a defendant, whether patently guilty or not, using techniques that pander to the potential biases or prejudices of jurors. *See, e.g.,* ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3rd ed.1993) at §§ 3–5.6 (prohibiting knowing use of inadmissible evidence or asking legally objectionable questions, or making impermissible comments), 3–5.7 (improper interrogation of witnesses prohibited), 3–5.8 (no intentional misstatement of evidence in argument to jury), and 3–5.9 (no intentional use of facts outside record).

[¶ 28] Finally, Wilde contends that the district court erred by commenting in front of the jury that the victim's appearance on the witness stand was an "ordeal" that he wanted completed on the one day she appeared at trial. No objection was made at the time, and the comment was fleeting. We find no reversible error here.

## Plain Error, Harmless Error, Nonprejudicial Error, and Cumulative Error

[¶ 29] Whenever a case involving the alleged commission of a very serious crime comes before this Court, we attempt to be vigilant in balancing the roles of trial judge, jury, prosecutor, and defense counsel, with that played by this Court in the appellate process. In this case, virtually none of the errors committed by the prosecution called into play the plain error doctrine. Not only did the trial court grant defense counsel's motion in limine with respect to many of the issues that appear in this case, but also timely and repeated objections were made by defense counsel and were often sustained by the district court. Nonetheless, the prosecution persisted in crossing the line into the territory of reversible error.

[¶ 30] With respect to harmless error, we note that application of that rule requires us to be able to conclude that the error did not affect a substantial right of the accused, that it was not prejudicial to the defendant, and that there is not a reasonable possibility that the verdict might have been more favorable to the defendant had the error not occurred. *Wilks v. State,* 2002 WY 100, ¶¶ 18–21, 49 P.3d 975, ¶¶ 18–21 (Wyo. 2002). It was crucial in this case that there be no "meddling" with the jury's role in determining the truth. We can only conclude that the repetition of very prejudicial hearsay evidence, the vouching for the credibility of the victim, and the admission of evidence designed to inflame the jury against Wilde deprived him of a fair trial, and the errors simply cannot be viewed as harmless or nonprejudicial.

[¶ 31] We will make brief mention of the concept of cumulative error because it might have played a role in this case, were it not

for the seriousness of the individual errors. In *Schmunk v. State,* 714 P.2d 724, 745 (Wyo. 1986), a plurality of this Court relied on an accumulation of errors that deprived the defendant of a fair trial as the basis for reversal of that defendant's conviction. It is not uncommon for an argument based on cumulative error to be made in this Court, but it is uncommon for us to apply it as the sole basis for reversal of a conviction in a criminal case. We need not cross that bridge today, but we view with a great deal of concern the number of criminal cases which come before this Court with multiple errors such as those we resolve here. We include this brief discussion of cumulative error to make clear that the doctrine is, indeed, an available tool to address prosecutorial excess.

## CONCLUSION

[¶ 32]   For the reasons set out above, the judgment and sentence of the district court are reversed, and the matter is remanded to the district court for new trial.

HILL, C.J., delivered the opinion of the Court; GOLDEN, J., filed a specially concurring opinion.

GOLDEN, J., specially concurring.

[¶ 33]   I agree that Wilde's conviction must be reversed; however, I depart with the majority on its resolution of the prior consistent statements issue. After reciting the *Stephens* rule that prior consistent statements are nonhearsay and admissible as either substantive evidence or for rehabilitative purposes, the majority decides that the trial court erred in admitting "hearsay testimony during the State's case-in-chief." The majority holds that the trial court abused its discretion by admitting hearsay testimony by the mother, sister, police officer, physician, nurse, and forensic interviewer that repeated the victim's allegedly fabricated story and holds that the abuse of discretion is reversible error because the repetition was highly prejudicial. A careful review of precedent shows that this Court has long held that, as a general rule, these kinds of statements are not hearsay, it is not an abuse of discretion to admit them when the defense has challenged

the victim's credibility, and repetition is not reversible error.

[¶ 34]   In a long line of cases, we have rejected the notion that W.R.E. 801(d)(1)(B) requires that the motive to fabricate must come after the hearsay statements in order for those statements to be admissible as prior consistent statements. *Cook v. State,* 7 P.3d 53, 58 (Wyo.2000); *Dike v. State,* 990 P.2d 1012, 1024 (Wyo.1999); *Frenzel v. State,* 849 P.2d 741, 751 (Wyo.1993); *Montoya v. State,* 822 P.2d 363, 367 (Wyo.1991); *Stephens v. State,* 774 P.2d 60, 71 (Wyo.1989); *Baum v. State,* 745 P.2d 877, 881 (Wyo.1987); *Makinen v. State,* 737 P.2d 345, 349 (Wyo. 1987). Most recently, we rejected the reasoning followed by the United States Supreme Court's decision in *Tome v. United States,* 513 U.S. 150, 165, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995), which held that a temporal requirement did apply under the federal rule. *Cook,* 7 P.3d at 58; *Dike,* 990 P.2d at 1024. We have also established that the charge of fabrication can arise by defense's pretrial assertions about its defense theory. *Lancaster v. State,* 2002 WY 45, ¶ 18, 43 P.3d 80, ¶ 18 (Wyo.2002); *Alicea v. State,* 13 P.3d 693, 698–99 (Wyo.2000); *Humphrey v. State,* 962 P.2d 866, 872 (Wyo.1998).

[¶ 35]   This considerable history illustrates this Court's comfort with interpreting Rule 801(d)(1)(B) as allowing consistent statements when credibility is at issue because of allegations of improper influence or recent fabrication. The precise rule was articulated in *Stephens* and was upheld as recently as our decision in *Dike* when eight witnesses repeated the victim's story as prior consistent statements and no limiting instruction was given to the jury. *Stephens,* 774 P.2d at 71–72; *Dike,* 990 P.2d at 1024. When this precedent is applied to the statements at issue in this case, I do not see how any conclusion can be drawn but that they, too, are postmotive prior consistent statements that are admissible nonhearsay statements.

[¶ 36]   Nor do I see how the admission of these statements during the State's case-in-chief should now be significant in determining error occurred when previously we have paid little attention to that fact. In *Lancas-*

*ter*, a videotape was admitted during the State's case-in-chief, *Lancaster*, ¶ 10, and no discussion was given to that fact in this Court's opinion. *Alicea* denied that any error occurred when the State presented prior consistent statements in its case-in-chief although the defense went to great lengths to prevent any justification for such admission by waiving opening statements and cross-examination. 13 P.3d at 698. *Alicea* found no error upon determining that the defense's theory would focus upon an express charge of recent fabrication or improper influence or motive. *Id.* at 698–99. *Humphrey* did find that it was error for the State to present a prior consistent statement during its case-in-chief before fabrication was alleged but ruled that the error was de minimis and resulted in no prejudice. 962 P.2d at 872. The majority attempts to distinguish *Alicea* based on whether the statements were made before reporting to authorities. However, that distinction is irrelevant because any temporal concern relates only to whether the statement may be offered as substantive evidence or whether the defense, if it requested, would be entitled to an instruction limiting the evidence for the purpose of evaluating credibility.

[¶ 37] In this case, the defense claimed that a motive to fabricate arose well before trial when the mother attempted to extort a vehicle from Wilde. The statements here are therefore postmotive and consistent with the victim's testimony at trial. Accordingly, the statements were admissible as nonhearsay under Rule 801(d)(1)(B) as rebuttal evidence. *Humphrey*, 962 P.2d at 872. Although the statements were admitted without limitation and then repeated by six witnesses, *Dike* has decided that occurrence is not reversible error. The majority has, however, decided that this occurrence is highly prejudicial and reversible error and the district court will be left to wonder what difference permits these two different results.

[¶ 38] We are all aware that the lack of a temporal requirement can lead to misuse, and we have all noted a pattern arising in child sexual assault cases where victims are interviewed by authority figures each of whom then repeat the victim's story at trial. This pattern raises two questions: whether interviews are arranged just to create "prior consistent statements" for presentation at trial, and, if so, whether these interviews constitute a misuse of the rule. Our precedent warns against this type of trial strategy, *Baum*, 745 P.2d at 882 (Cardine, J., dissenting), while at the same time recognizing that repetition is of so little probative value it may not be prejudicial. *Stephens*, 774 P.2d at 72. I am not adverse to addressing whether the misuse that our precedent has long warned us of has now come to pass and requires action on our part.

[¶ 39] If the majority has decided that admission of postmotive consistent statements made before the declarant's testimony produced a fundamentally unfair trial for Wilde, then the majority should articulate that basis for its decision. If, however, the majority has decided that these circumstances require that *stare decisis* should give way, then imposition of a temporal requirement must be discussed. Until that reasoning is presented, I must disagree with the majority's decision to depart from precedent without analysis.

[¶ 40] I must also question why the majority would find that AN was competent to testify but may have been coached about what she had seen at the time that AM alleges Wilde was sexually assaulting her. We have previously held that when taint is alleged, a competency hearing must determine whether a suggestive interview or coaching occurred and, if it did, whether that coaching has infected the witness' ability to independently recall events to such an extent that her testimony would be too unreliable to admit at trial. *English v. State*, 982 P.2d 139, 145–46 (Wyo.1999). If the trial court failed to properly conduct the competency hearing, the majority errs in stating that "[w]e do not question in any way the trial court's decision that the victim was competent to testify." The appropriate resolution is to remand the reliability issue for rehearing upon retrial.