2004 WY 103

**Lee Lloyd LOPEZ, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 03–76.

Supreme Court of Wyoming.

Sept. 7, 2004.

Representing Appellant: Kenneth Koski, State Public Defender; Donna Domonkos, Appellate Counsel; Tina N. Kerin, Senior Assistant Appellate Counsel; Diane Courselle, Director, and Bob Hitchcock, Student Intern, of the Wyoming Defender Aid Program. Argument by Mr. Hitchcock.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Georgia L. Tibbetts, Senior Assistant Attorney General; Theodore E. Lauer, Faculty Director, and Robert W. Ingram, Student Director, of the Prosecution Assistance Program. Argument by Mr. Ingram.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

GOLDEN, Justice.

[¶ 1]   In this appeal, Lee Lloyd Lopez, convicted of third degree sexual assault of CS, the ten-year-old daughter of Mr. Lopez's ex-wife, raises three issues in this effort to overturn the judgment and sentence of im-

prisonment for not less than six nor more than eight years in the Wyoming State Penitentiary. Mr. Lopez contends that a prosecution witness, Lynn Huylar, a social worker and self-styled "forensic interviewer" at a child advocacy center, impermissibly vouched for CS's truthfulness; the trial court violated his constitutional right to present a defense when it excluded evidence that showed an alternative source for CS's sexual knowledge and evidence that showed CS had reason to believe that an accusation of the kind made could get the attention of adults without getting the person accused into serious trouble; and the prosecutor committed misconduct during Mr. Lopez's cross-examination by trying to goad Mr. Lopez into inviting inadmissible evidence, and the trial court erroneously changed a previous evidentiary ruling on the inadmissible evidence in question which allowed the prosecutor to benefit from the misconduct. We hold that prosecution witness Huylar impermissibly vouched for CS's truthfulness and, therefore, we reverse and remand for a new trial.

### GENERAL STATEMENT OF FACTS

[¶ 2] CS was born May 10, 1990, to DS, her father, and KL, her mother. They also had a younger son, KS. DS and KL separated for nine months and eventually divorced June 11, 1999, when CS was eight years old. DS received custody of CS and KS; they live in Laramie. Her parents' divorce was emotionally difficult for CS; she began and continued professional counseling for several years and was in counseling with her school counselor at the time of her accusations against Mr. Lopez. KL worked at Behavioral Health Services; she was Mr. Lopez's counselor. KL and Mr. Lopez married June 17, 1999, six days after her divorce from DS. This marriage ended in divorce on March 31, 2000, but the couple maintained a relationship, a son, J, being born to them in January 2001. CS's mother and Mr. Lopez were living in Cheyenne. About every other weekend, CS and KS would visit their mother in Cheyenne. Mr. Lopez was present in their mother's home during these visits; he often took the children on recreational outings. A friendly relationship developed between Mr. Lopez and the children. Mr. Lo-pez had martial arts training; occasionally he and CS rough-housed and wrestled, CS often initiating the contact.

[¶ 3] On Presidents' Day weekend in 2001, CS, then age 10, and KS visited their mother, Mr. Lopez, and J in Cheyenne, arriving on Friday, February 16, and returning to Laramie on Monday, February 19. On Saturday, February 17, CS and KS accompanied Mr. Lopez to a martial arts tournament in Denver. That evening the family dined at a restaurant, returned to KL's home, and watched television. All of the family members, except for CS and Mr. Lopez, went to bed; CS and Mr. Lopez continued watching television.

[¶ 4] Mr. Lopez and CS began wrestling, first on the floor and then on the couch. At trial, CS testified that Mr. Lopez had her "pinned on the couch, or something like that. . . . He was kind of laying on me . . . more like sitting and leaning on me." Her left leg was pinned against the side of the couch. Mr. Lopez began tickling CS, first her feet, then moving up to her knee and to her thigh, "and then he moved up closer in between." She testified that Mr. Lopez touched her on her "private area," with his index finger, and was "kind of tickling" her. She testified that this tickling of her private area lasted for more than ten seconds. CS was giggling, and it tickled. She told Mr. Lopez to stop, but he kept tickling her. She did not know for how long it continued. Finally, she went to her room and went to bed.

[¶ 5] According to KL, CS's mother, the next day CS was sick to her stomach and did not want to come out of the bathroom. CS testified, however, that she and KS started teasing and kickboxing with Mr. Lopez in the hallway the next day. CS ran up to Mr. Lopez and playfully kicked him. Mr. Lopez turned around, and they began wrestling again. Mr. Lopez testified that CS did not indicate that she was uncomfortable with this contact or ask him to stop. At trial, CS testified that Mr. Lopez tickled her in her private area on the outside of her jeans while they were rough-housing. Mr. Lopez denied that he tickled her there. Mrs. Lopez and

KS were in the area while all of this was going on.

[¶ 6] CS did not immediately tell her mother that Mr. Lopez had touched her "private area." And she did not immediately tell her father when she returned home to Laramie on Monday, February 19. The first person she told was her sitter, Trish Brady, on Wednesday, February 28, eleven days after the alleged incident. Ms. Brady called CS's father, DS, to come home. CS talked to her father; he did not notify authorities. Instead, DS told CS to talk to her school counselor, Linda Kaiser, about it.

[¶ 7] On March 6, 2001, CS was interviewed by Lynn Huylar, a social worker employed as program director and forensic interviewer by Safe Harbor, a children's justice center. The interview was recorded on videotape. On March 7, 2001, Mr. Lopez was interviewed by Cheyenne Police Department Detective Ray Bilkie and made a statement to Detective Bilkie which was recorded on audio tape.

[¶ 8] At trial, CS testified that Mr. Lopez had inappropriately touched her; Mr. Lopez testified and denied that he had inappropriately touched CS. There was no physical evidence of the alleged assault. Additional facts relevant to each of the three issues before us are set forth as necessary below.

*Issue One:* **Whether the State's witness, Lynn Huylar, social worker and forensic interviewer, impermissibly vouched for CS's truthfulness during her testimony as a prosecution witness.**

*Background facts*

[¶ 9] Before the trial, Mr. Lopez's trial counsel filed a motion in limine, moving the court to rule that the prosecutor and the State's witnesses refrain from stating an opinion that CS was molested. The court ruled that witnesses, with the exception of CS, could not testify that, in their opinion, Mr. Lopez molested CS or that CS's statements were true.

[¶ 10] During the prosecutor's opening statement to the jury, the following occurred:

[Prosecutor]: Lynn [Huylar] specializes in conducting forensic interviews with chil-

dren, and Miss Huylar will explain to you the basics of conducting a forensic interview, how her interview with [CS] went, what the requirements of that interview were based on her experience.

She'll tell you that [CS's] story was consistent. It was full of important contextual details, and that the dialog [CS] used in conveying the incident was very age appropriate. She'll tell you she classified the interview as a credible disclosure.

[Defense]: Your Honor, I'm going to have to object, sounds like there's some vouching and argument going on.

The Court: Well, he may indicate what the expected testimony will be.

[Prosecutor]: May I continue?

The Court: Go ahead.

[Prosecutor]: [CS's] story to this point to March 5th to Trish Brady, to her father; to Mrs. Kaiser, the school counselor, and now Miss Huylar was consistent.

[Defense]: Your Honor, I'm going to have to object again. It's argumentative, and if the State is going to put these people on the stand, I'm going to be objecting. It sounds like they're vouching for credibility, and it's inappropriate.

The Court: Well, it is going past opening statement into argument. I'll sustain that objection.

[¶ 11] CS, CS's day-care provider, CS's mother, CS's father, and a friend of Mr. Lopez testified before the prosecutor called Lynn Huylar. Immediately before Ms. Huylar took the stand as a prosecution witness, Mr. Lopez's trial counsel expressed concern to the court and the prosecutor at a bench conference that Ms. Huylar would be using terms like "credible" and "credibility." Mr. Lopez's trial counsel wanted "to object to her doing that right now before she even begins." The prosecutor, in responding to the anticipatory objection of Mr. Lopez's trial counsel, responded twice:

Your Honor, that was handled in a motion in limine. [Lynn Huylar] did find the report was credible; however, she doesn't—and she will say that that doesn't mean [CS] was telling the truth. Those

are the terms of art used in her profession to classify a disclosure, and she classified it as credible. It's part of our findings in this case.

\* \* \* \*

The case law in Lancaster's clear that you can say these are the things on which I conduct my interview, whatever the case may be, and this is what I found. That is not impermissible. She's not going to say that [CS's] telling the truth. She's going to say, "In my field, these are the things I look for, and based on my training, and experience, I found this particular report to be credible." That does not necessarily mean she was telling the truth.

The trial court responded, "I think I understand that distinction, but in common parlance, it might be a distinction without a difference to the jury." The court ruled that the words "credible" and "credibility" were not to be used in Ms. Huylar's testimony.

[¶ 12] During the prosecutor's direct examination of Ms. Huylar, the prosecutor asked what CS had told her; Mr. Lopez's trial counsel lodged a hearsay objection and requested a continuing objection out of concern about improper vouching. The court overruled the hearsay objection and did not address the request for a continuing objection. Later in the prosecution's direct examination of Ms. Huylar, Ms. Huylar testified as follows:

[Prosecutor]: Is there anything else about the interview [with CS] that you should share with the jury?

Huylar: I will. The interview process is a way of obtaining information, and it has a methodology use to it. It's a subsequent way. I use the same kind of methodology that I did with [CS] on all the other interviews that I do, so it doesn't change. It's very specific methodology. It's very scientific, and I'm testing things because I want to make sure that the information we get is true and accurate.

Mr. Lopez's trial counsel did not make a contemporaneous objection to that testimony.

[¶ 13] During cross-examination of Ms. Huylar by Mr. Lopez's trial counsel, counsel explored generally the making of false allega-

tions by children. Mr. Lopez's counsel inquired whether various factors in connection with the making of false allegations had been present in Ms. Huylar's interview of CS. Finally, counsel asked:

Q. Children can make false allegations; isn't that correct?

[Huylar]: That can happen.

Q. And it does happen?

A. It can happen.

Q. Does it happen? Have kids falsely accused people, to your knowledge?

A. To my knowledge, there have been instances, yes; yes, but hopefully, we assess that through the process.

[¶ 14] On redirect examination by the prosecutor, in response to a question whether Ms. Huylar had found false allegations in her interview in this case, Ms. Huylar responded, "It did not—I didn't find those elements that would concern me saying it was a false allegation." Mr. Lopez's trial counsel did not make a contemporaneous objection to this answer.

[¶ 15] In the prosecutor's closing argument, the prosecutor commented several times on Ms. Huylar's testimony. Excerpts of those comments reveal these comments:

[CS is] interviewed by Lynn Huylar, who's a trained forensic interviewer. That's what she does. She discusses these types of things with kids. She has a protocol. She's taught over thousands of kids about this. She is trained to look for inconsistencies in their story. She's trained to look for age-appropriate language, and she testified, and Lynn told you there was no language that this child used that was inappropriate for a 10–year–old child.

She told you she evaluated her competency, she found her to be competent; she could understand concepts, in, out, over[.] She is trained to look for third-party influence, things like using language that is inappropriate. [CS] didn't use any language that was inappropriate.

Lynn Huylar found no evidence of any third-party influence. She's trained to look and determine whether or not the child has actually lived the experience, has

this child lived through this experience, thing like contextual details.

Now, she didn't mean things like, "Now, is there a candlestick up on the mantel?" She means things like, "How did it feel?" [CS] told you how it felt. "What did you think when this happened?" "I was stunned." That's what [CS] testified. Those are emotions and feelings you would have if it were to happen to you, if you were to live through the experience, the contextual details of, "We were watching TV. I was on the couch. He was on the couch. I was laying with my feet this way. He pinned my leg up behind his back. He started tickling my thigh. He started tickling my legs. He moved up, and he tickled me over my underwear." [C]ontextual details that she could give to you.

Motivational reasons. Why would [CS] not tell the truth? Lynn Huylar could find none. The defendant was asked by Detective Bilkie, "Any reason why, that you can think of, this child might not tell the truth, might be making up these things?" Lynn Huylar could find none, and neither could he. Folks, I submit to you, because there are no reasons for her to make it up. There are none.

\* \* \* \*

Lynn Huylar, who had interviewed the child; Lynn Huylar, who had done this a number of times; Lynn Huylar, who is a trained forensic interviewer could find nothing wrong with that child's story, with that child. She told her what had happened.

[¶ 16]   In the prosecutor's rebuttal closing argument, he made these final comments about Ms. Huylar's testimony:

Lynn Huylar is not an investigator. She is not a police investigator. It is not her job to talk to the defendant. It's not her job to investigate the crime that occurred. Her job is to evaluate what the child is saying.

That's Lynn's job. What happens from there is out of her hands, whether the State presses charges, whether the defendant's interviewed or not interviewed, what other witnesses are interviewed or not interviewed. That is not her job. Her job is

to evaluate what the child is saying. Years at the Department of Family Services in the sexual abuse unit, at the Department of Family Services interviewing thousands of kids, specialized training on how to interview kids throughout her career. Yes, I think that that may separate her from us in this area. That's experience and training in this area upon which she can base an opinion. That's specialized experience and training. She's done it thousands of times, and she did not say—she did not say that in her career only two kids have ever lied. She didn't say that.

*Standard of Review*

[¶ 17]   Mr. Lopez focuses on two particular instances of Ms. Huylar's direct examination testimony: (1) when characterizing her "very specific" and "very scientific" interview methodology, she said she is "testing things because I want to make sure that the information we get is true and accurate;" and (2) when the prosecutor in essence asked whether she found elements of a false allegation in CS's disclosure during her interview, she answered, "I didn't find those elements that would concern me saying it was a false allegation."

[¶ 18]   Mr. Lopez urges us to forego the abuse-of-discretion standard of review ordinarily applicable to the trial court's evidentiary rulings and, instead, to use an error per se standard as is used when testimony offers an opinion that the accused is guilty of the charge being tried. *Stephens v. State*, 774 P.2d 60, 68 (Wyo.1989); *Bennett v. State*, 794 P.2d 879, 881 (Wyo.1990).

[¶ 19]   The State contends, however, that the proper standard of review to apply to these two particular instances of Ms. Huylar's testimony is not entirely clear because Mr. Lopez's trial counsel did not make specific contemporaneous objections to them. Arguably, the State asserts, plain error is that proper standard of review in such a case, and, the State points out, Mr. Lopez's principal brief does not present a plain error analysis. Concluding, the State maintains that the abuse-of-discretion standard of review applies.

[¶ 20]   A study of Mr. Lopez's principal brief reveals, however, that his trial counsel had, in effect, "preemptively" objected to Ms. Huylar's improper vouching testimony four times before the two particular instances occurred.   Mr. Lopez's appellate counsel lists the four objections: the pre-trial motion in limine, the objection during the prosecutor's opening statement to the jury, the objection immediately before Ms. Huylar's direct examination, and the "continuing objection" lodged early in Ms. Huylar's direct examination.   With respect to this "continuing objection," the State notes that the Wyoming Rules of Evidence apparently do not specifically address it; further, the State argues, it would appear incongruous for the trial court to permit such an anticipatory objection to an entire class of evidence.   It is true, however, that the trial court has broad discretion in exercising reasonable control over the mode of witness examination and evidence presentation in order to avoid needless consumption of time.   W.R.E. 611(a).   Indeed, our review of the record reveals that, before Ms. Huylar's direct examination, the trial court recognized Mr. Lopez's trial counsel's use of a continuing hearsay objection during the prosecutor's direct examination of CS's day-care provider.   Given that practice by the trial court with that witness, we believe that Mr. Lopez's trial counsel reasonably relied on that practice when making the continuing improper vouching objection to Ms. Huylar's testimony.

[¶ 21]   Having carefully considered the parties' standard-of-review skirmish, we cannot conclude that Mr. Lopez's trial counsel failed to preserve the improper vouching issue for appeal.   Counsel alerted the trial court before trial and at every appropriate point as the trial unfolded and Ms. Huylar's testimony was offered that she objected to any attempt by the prosecution to bolster the testimony of the alleged victim with any form of testimony concerning her credibility.   "[A] defense attorney does not have to walk over any more legal coals to protect the record after first stating the grounds for objection." *State v. Milbradt*, 305 Or. 621, 756 P.2d 620, 624 (1988).   Consequently, we shall apply the abuse-of-discretion standard of review.   In *Seward v. State*, 2003 WY 116, ¶ 13, 76 P.3d 805, ¶ 13 (Wyo.2003), we set forth the steps of such review:

> Rulings on the admissibility of evidence are committed to the sound discretion of the district court and are not subject to appellate second guessing absent an abuse of discretion.

*Curl v. State*, 898 P.2d 369, 373 (Wyo. 1995).

> We have described the standard of an abuse of discretion as reaching the question of the reasonableness of the trial court's choice. *Griswold v. State*, 2001 WY 14, ¶ 7, 17 P.3d 728, ¶ 7 (Wyo.2001). Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Id.* "In the absence of an abuse of discretion, we will not disturb the trial court's determination." *Id.* The burden is on the defendant to establish such abuse. *Trujillo* [*v. State* ], 2 P.3d [567] at 571 [ (Wyo. 2000) ].

> "If the trial court erred by admitting evidence, we then must ascertain whether the error affects any substantial rights of the accused, providing grounds for reversal, or whether it is harmless.   The harmless error standard is set out in W.R.A.P. 9.04:

>> Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded by the reviewing court."

> *See also* W.R.Cr.P. 52.   An error is harmful if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had never occurred.   To demonstrate harmful error, the defendant must show prejudice under 'circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play.' *Johnson v. State*, 790 P.2d 231, 232 (Wyo.1990)."

*Solis [v. State ]*, 981 P.2d [34] at 36 [ (Wyo.1999) ] (some citations omitted); *see also Ryan v. State*, 988 P.2d 46, 52–53 (Wyo.1999)."

*Skinner v. State*, 2001 WY 102, ¶ 25, 33 P.3d 758, 766–67 (Wyo.2001), *cert. denied*, 535 U.S. 994, 122 S.Ct. 1554, 152 L.Ed.2d 477 (2002).

### Discussion

[¶ 22] The State and Mr. Lopez recognize that this Court, in a long line of decisions, has clearly and unambiguously held it is error for expert and lay witnesses alike to vouch for the credibility of the testimony of an alleged sexual assault victim. *See, e.g., Seward*, ¶¶ 18–29 (expert witness); *Wilde v. State*, 2003 WY 93, ¶¶ 17–19, 74 P.3d 699, ¶¶ 17–19 (Wyo.2003) (expert witness); *Curl*, 898 P.2d at 373–74 (lay witness); *Whiteplume v. State*, 841 P.2d 1332, 1337–41 (Wyo.1992) (lay witness); *Stephens*, 774 P.2d at 68 (expert witness); *Zabel v. State*, 765 P.2d 357 (Wyo.1988) (expert witness); and *Lessard v. State*, 719 P.2d 227, 232–34 (Wyo. 1986) (expert witness). The State and Mr. Lopez specifically focus on *Seward* and *Wilde* because in those decisions this Court held that Ms. Huylar's testimony erroneously vouched for the alleged sexual abuse victim's credibility. Mr. Lopez argues that Ms. Huylar's testimony in his trial was "virtually identical" to her erroneous testimony in those previous decisions. The State, on the other hand, argues that, although Ms. Huylar's testimony in Mr. Lopez's trial was similar to her testimony in those other decisions, the scope and nature of her vouching testimony identified in those other decisions was substantially more extensive than in the present case. Although Mr. Lopez appears to question whether Ms. Huylar testified as an expert, the State argues that she did, and we agree that it is clear from the record that she did.

[¶ 23] Although the State labors mightily to try to distinguish Ms. Huylar's testimony in this case from her testimony condemned in *Seward* and *Wilde*, we are unconvinced. The criticisms leveled at her vouching testimony in those decisions are equally appropriate to her testimony in this case. In this case, as in those, Ms. Huylar testified that she has conducted thousands of interviews with children; she has had extensive training in forensic interviewing of children; the word "forensic" "means more of a scientific kind of interview" in which she uses a "semi-structured protocol;" she "builds rapport with the child;" she does a "developmental assessment" of the child; she looks at "competency;" she determines whether the child knows "the difference between the truth and a lie;" she looks for "elements of coaching or a third-party influence;" she commits the child "to tell the truth during our interview process;" she looks for "contextual details," *i.e.*, "details that only a person that's [sic] actually witnessed something would be able to provide;" she looks for motivational reasons for the child's disclosure; and she looks for alternative explanations for the disclosure. Ms. Huylar testified that CS, age 10, was "developmentally at her age," and "had an understanding of truth and lie, and she could commit that she would tell me the truth." She testified she "did not find any other elements to suggest that someone had told her what to say … or that she was influenced in any way by a third-party." She testified that CS "was able to give contextual details" of the incident in question. She testified she found "no elements to support … that there had been any dramatic reasons for the disclosure. . . . [S]he thought [Mr. Lopez] was cool up until this event." She testified she found no plausible alternative explanation for the disclosure. She testified that her interview process "has a methodology use to it. . . . It's a very specific methodology. It's very scientific, and I'm testing things because I want to make sure that the information we get is true and accurate." On cross-examination, Ms. Huylar testified "there's no certification that provides for certification in forensic interviewing." She testified she is neither a psychologist or psychiatrist. She testified that forensic interviewing is abstracting and assessing information given to her in the interview. She testified that in her interview she is "looking for specific information … and … staying specifically focused, and I'm not there to talk about treatment modalities or what they're working on in treatment." She testified that her "level stops after the inter-

view." In further explaining her role in working with law enforcement in these kinds of cases, she testified that she is "given a child to interview. There has been an allegation made, and then it's my job to obtain some information and to test some things, and rule out some things . . . ." In explaining her job in false allegations, she testified her job "is to become critical of the interview process, to take a look at those elements, to assess that during the whole process, and . . . that factors into where the investigation goes from that point on. If we find elements of that, cases turn very different, and we as a team assess that, and we factor that in, and that's part of the whole investigation." Answering the prosecutor's last question on re-direct examination, whether she found elements of a false allegation in her interview with CS, Ms. Huylar answered, "I didn't find those elements that would concern me saying it was a false allegation."

[¶ 24] As we have done in *Seward* and the other cases examining this type of testimony, we have here also considered the prosecutor's use of this testimony in this case. Appreciating the absence of physical evidence of the alleged inappropriate touching and that the jury's verdict turned on the credibility contest between CS and Mr. Lopez, the prosecutor argued "if you believe that 12–year–old child when she was sitting on that witness stand, and you believe what she told you was the truth, that is all the evidence you need." The prosecutor argued Ms. Huylar's evidence: She is a "trained forensic interviewer;" "she has a protocol;" "[s]he is trained to look for inconsistencies in [a child's] story;" she found CS competent; she "found no evidence of any third-party influence;" she found "contextual details;" she could find no motivational reasons why CS would not tell the truth; she, "a trained forensic interviewer[,] could find nothing wrong with [CS's] story." In rebuttal closing argument, the prosecutor revisited Ms. Huylar's testimony:

> Her job is to evaluate what the child is saying. Years at the Department of Family Services in the sexual abuse unit, at the Department of Family Services interviewing thousands of kids, specialized training on how to interview kids throughout her

career. Yes, I think that that may separate her from us in this area. That's experience and training in this area upon which she can base an opinion. That's specialized experience and training. She's done it thousands of times . . . .

[¶ 25] Our appellate assessment here is the same as our assessments in *Seward, Wilde,* and *Zabel:* Ms. Huylar's testimony, in the two specifically identified instances and in the instances we have identified above, constituted harmful vouching and reversible error, especially given the difficult credibility issues the jury had to assess in this case. "Credibility was the central issue in the case—a close factual dispute existed regarding whether to believe the victim's testimony, or appellant's testimony . . . . The evidence of appellant's guilt does not rise to the level of 'overwhelming' nor was any physical evidence introduced to support the State's case." *Seward,* ¶ 29. Accordingly, because an expert witness "essentially vouched directly for the victim's credibility based solely on the content of the victim's disclosure, and considering the prosecutor's utilization of that testimony during closing and rebuttal argument, we find that a reasonable possibility exists that the verdict might have been more favorable to the appellant if the error had never occurred." *Id.* We have said it many times before, and we will say it again, and this time with more emphasis—we really mean it: no "forensic interviewer" may testify directly or inferentially on whether an alleged victim is credible. The assessment of credibility is exclusively for the trier of fact.

[¶ 26] Although resolution of this issue is dispositive of this appeal, we shall now address the two other assigned issues because they may recur on retrial.

***Issue Two:*** **Whether the trial court's evidentiary ruling excluding Mr. Lopez's evidence of CS's 1998 report to DFS concerning her mother's sexual behavior violated Mr. Lopez's constitutional right to present a defense.**

*Statement of the Specific Facts*

[¶ 27] Before the trial in this case, the prosecutor filed a "Motion in Limine—Ex-

clude Evidence of Prior Report Made by C.S." In the motion the prosecutor noted that in October of 1998 a report had been made to the Department of Family Services that CS had observed her mother masturbating in a bathtub. An investigation had been made, and the Department of Family Services had determined that the claim was unsubstantiated, with the result that no further action was taken. The prosecutor argued that the 1998 occurrence was not relevant to the case against Mr. Lopez and was not impeachment evidence in any sense. The prosecutor further asserted that any probative value of such evidence was outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury; and the evidence was not admissible under W.R.E. 608 as evidence of the character of a witness.

[¶ 28] Mr. Lopez's counsel responded to the prosecutor's motion, arguing that the 1998 allegations made by CS regarding her mother's conduct were relevant in that, if the allegations were false, such was relevant as to whether CS had made a false allegation against Mr. Lopez in the present case. Alternatively, counsel argued that if CS's allegations were true, they were relevant to show an alternative source of CS's sexual knowledge, and an improper motive on the part of CS.

[¶ 29] The court held a hearing on the prosecutor's motion in limine. The prosecutor asserted that, in 1998, when CS was eight years old, she observed her mother masturbating in the bathtub and reported that fact; the acts did not fall within child abuse guidelines, and the Department of Family Services filed a report that the allegations were unsubstantiated. Subsequently, CS's mother admitted that CS saw her washing her private parts while the child was in the bathroom. The prosecutor argued that the 1998 occurrence was not relevant to the present charges against Mr. Lopez and could not be used to attack the credibility of CS.

[¶ 30] Mr. Lopez's counsel responded that CS's allegations had been made during the time of her parents' divorce, when there was controversy over the custody of CS and her brother. Counsel argued that the prior occurrence was relevant in order to impeach the credibility of CS. He further argued that, if CS had seen her mother masturbate, it was admissible as a source of CS's sexual knowledge.

[¶ 31] The court ruled that, while prior false accusations by an alleged victim of a sexual assault would be relevant, in the present case it had not been shown that CS had made a false report. Accordingly, the court granted the prosecutor's motion in limine, although it agreed to consider the authority cited by Mr. Lopez's counsel and indicated it would reverse its ruling if appropriate.

[¶ 32] The first day of trial, Mr. Lopez's counsel filed a motion to reconsider the court's ruling on the prosecutor's motion in limine. Counsel argued that, if CS had mistakenly reported, it was relevant to the possibility that CS had also been mistaken when she reported that Mr. Lopez had touched her private parts. Counsel reiterated that the incident with CS's mother was relevant as a source of CS's sexual knowledge. The motion to reconsider was accompanied by copies of the Department of Family Services investigatory file from 1998.

[¶ 33] At trial, in the cross-examination of CS, the following took place:

[Defense]: He tickled your private parts?

[CS]: Yes.

Q. It was after you were done, and he tickled you on your foot?

A. Yes.

Q. And you were giggling, and then you said he moved up farther and tickled you on your private part?

A. Yes.

Q. Had you ever seen anything like that, tickling your private parts ever before?

A. Well, my mom did, but that's about it.

The prosecutor promptly objected that this questioning was in violation of the court's order on the prosecutor's motion in limine. Mr. Lopez's counsel argued that the information was relevant and asked the court to reconsider its ruling and to permit the questioning. The court ruled that counsel should "make no further inquiry on that," but that she could make an offer of proof.

[¶ 34] At the close of the prosecution's case-in-chief, Mr. Lopez's counsel made an offer of proof relating to Mr. Lopez's motion to reconsider the order granting the prosecutor's motion in limine. Mr. Lopez's counsel called as witnesses CS and CS's mother. CS testified that her "mother was taking a bath one day, and my brother and I went in there, or something, just to go visit with her, and then she started putting her hand somewhere between her vagina and started, well, touching herself in between the vagina lips." CS described her mother's act with her hand as "kind of like she was sawing."

[¶ 35] CS's mother testified that in October of 1998, CS had said she had seen her doing something sexual, *i.e.*, masturbating in the bathtub. CS's mother admitted that she had indeed been masturbating. Mr. Lopez's counsel then argued that, in light of Lynn Huylar's testimony of the importance of contextual details in a child's story, "this prior experience would be proper impeachment of [CS] to show that she knows these details, and she knows of these things because she's seen her mother do them." The trial court denied the motion to reconsider its ruling excluding this evidence, stating that now that it appeared that CS's 1998 allegation was in fact true, "I think it's just remote and collateral, and question the probative value. It just doesn't go at all to her credibility in this case, and so I will not change that earlier ruling."

*Standard of Review*

[¶ 36] This Court has repeatedly articulated the standard of review for evidentiary rulings:

> Evidentiary rulings are within the sound discretion of the trial court and include determinations of the adequacy of foundation and relevancy, competency, materiality, and remoteness of the evidence. This Court will generally accede to the trial court's determination of the admissibility of evidence unless that court clearly abused its discretion.

*Solis v. State*, 981 P.2d 34, 36 (Wyo.1999) (citation omitted). We have described the standard of an abuse of discretion as reaching the question of the reasonableness of the trial court's choice. Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. "In the absence of an abuse of discretion, we will not disturb the trial court's determination." [*Griswold v. State*, 2001 WY 14, ¶ 7, 17 P.3d 728, ¶ 7 (Wyo.2001.)] The burden is on the defendant to establish such abuse.

*Goulart v. State*, 2003 WY 108, ¶ 17, 76 P.3d 1230, ¶ 17 (Wyo.2003) (quoting *Willis v. State*, 2002 WY 79, ¶ 16, 46 P.3d 890, ¶ 16 (Wyo.2002) (quoting *Skinner v. State*, 2001 WY 102, ¶ 25, 33 P.3d 758, ¶ 25 (Wyo.2001))).

*Discussion*

[¶ 37] Mr. Lopez argues that CS's 1998 accusation was relevant because, "if the allegation was true, it could show an alternate source for the sexual knowledge CS expressed in her allegation against" Mr. Lopez. While it may be true that an alternative source of a young child's knowledge regarding complex or bizarre sexual activities could be relevant where the child has made current allegations of unusual sexual practices, nothing of the sort is present in this case. *Cf. Griswold v. State*, 994 P.2d 920, 923–24 (Wyo. 1999) (A seven-year-old girl and her companion reported that Griswold had anally and vaginally penetrated them both digitally and with his penis, had performed cunnilingus upon them, and had forced them to perform fellatio upon him.) *See also Griswold v. State*, 2001 WY 14, ¶¶ 18–20, 17 P.3d 728, ¶¶ 18–20 (Wyo.2001).

[¶ 38] In this case, the sexual contact consisted of simple touching accompanied by some digital "tickling." No special sexual knowledge is involved when a child reports such conduct. Even the youngest child has a sense of bodily integrity which is violated when the child is touched inappropriately. There is no showing that CS at the age of ten lacked a general sense of the impropriety of an invasion of her bodily privacy, such as that involved here. Her ability to report this touching was not contingent upon her acquisition of knowledge of sexual acts or that

such touching might be considered sexual in nature. It depended simply on the fact that she was uncomfortable with Mr. Lopez's alleged touching her private parts.

[¶ 39] Mr. Lopez further asserts that the prior experience of CS showed "her ability to fabricate a detailed description of how she was touched." This claim is likewise without substance. There is nothing in the record to substantiate the implication that CS ever "fabricated" anything. The earlier report of her mother's masturbation was true; nothing was fabricated there. That CS truthfully reported one experience cannot rationally support an inference that her report of a later experience of a different kind was fabricated. Also, CS did not provide a "detailed description of how she was touched." She simply reported that Mr. Lopez had "tickled" her private parts. Evidence regarding the 1998 accusation made by CS simply does not suggest that she had the capacity or inclination to create a detailed fabrication.

[¶ 40] Mr. Lopez next claims that because CS was aware her mother did not suffer any major consequences as a result of her earlier report, such may have led CS to believe she could make a false report regarding Mr. Lopez in order to get a brief reprieve from her weekly visit to see her mother and Mr. Lopez, without Mr. Lopez, who she did not dislike, being in serious trouble. This claim rests upon speculation. It was properly rejected by the district court. Moreover, there was nothing to prevent Mr. Lopez's counsel on cross-examination from directly asking CS whether she had fabricated her accusation against Mr. Lopez for this somewhat attenuated reason. CS was never asked by Mr. Lopez's counsel whether she would rather not have visited her mother, or what alternative things she would rather have been doing. Such questions were not barred by any order of the district court, yet none were asked. In short, this claim is speculative.

[¶ 41] Mr. Lopez also asserts that the 1998 occurrence was relevant to the present charges because "what [CS] saw her mother do and what she alleged happened to her were similar." But the "similarity" is attenuated at best. CS saw her mother touch herself; what happened to CS is that Mr.

Lopez allegedly improperly touched CS's private parts. The only "similarity" is that the female genitals were involved in both instances. Again, the claim of relevance is simply too tenuous. That CS, when asked whether she had "ever seen anything like" Mr. Lopez's act of tickling her private parts, answered that her mother had done it, does not show that CS fabricated her report that Mr. Lopez had touched her inappropriately.

[¶ 42] Finally, Mr. Lopez argues that CS's use of the term "lips" to describe genital labia both in 1998 and in the present case "suggests CS could have been using her prior knowledge to fabricate the allegations against" Mr. Lopez. Mr. Lopez claims that "lips" is a term "one might not ordinarily expect from a ten-year-old." There is nothing in the record, however, to suggest that CS's use of "lips" to describe her feminine anatomy was at all unusual for a ten-year-old child.

[¶ 43] None of the arguments advanced regarding the relevancy of CS's 1998 report regarding her mother stand up under scrutiny. In ruling on this evidentiary issue, the trial court did not abuse its discretion.

## *Issue Three:* **Prosecutorial Misconduct.**

### *Statement of Specific Facts:*

[¶ 44] Before trial in this case, Mr. Lopez's counsel filed a "Motion in Limine—Reference to Defendant Being Sexually Abused as a Child." The motion asked for an order "instructing the prosecutor ... to refrain from using as evidence or making any direct or indirect mention whatsoever to the fact that Mr. Lopez was sexually abused as a child." The motion stated that Mr. Lopez "told law enforcement that he was sexually abused as a child. The state intends to use such evidence to argue that individuals that [sic] are sexually abused are likely to abuse children." Mr. Lopez argued that whether he was abused as a child was not relevant to the issues in this case, and, further, that "[t]here is no scientific proof to support the state's theory." Finally, counsel contended that the evidence was "dangerously close to inadmissible character/propensity evidence,"

and that the "danger of unfair prejudice substantially outweighs any probative value."

[¶ 45] Counsel's motion in limine was argued in a motions hearing. The trial court heard argument from Mr. Lopez's counsel and from the prosecutor regarding the admissibility of Mr. Lopez's statement, made to Detective Ray Bilkie during a taped interview, that he had been sexually abused when he was a child. The court initially observed that one of Mr. Lopez's admissions to the detective was admissible under an exception to the hearsay rule because he admitted "having been alone with the child at certain critical periods of time. It seems to me that that admission would be admissible, but his reference to having been abused himself I think would not be admissible by the State." The court stated that the reference to Mr. Lopez's having himself suffered abuse was "not an admission, but rather, a denial," because it constituted an explanation that Mr. Lopez was aware of the harm that sexual abuse might inflict.

[¶ 46] The prosecutor responded that any statement by Mr. Lopez came within the scope of W.R.E. 801(d)(2), whether or not it was against the interest of the declarant. The court expressed its opinion that, to qualify under W.R.E. 801(d)(2), a statement had to be an "admission"—that is, it had to be against the declarant's interest. The prosecutor pointed to the fact that Rule 801(d)(2) referred to a "statement" by a party, not to an "admission" by a party. The court maintained its position that Rule 801(d)(2) applied only to admissions, and the prosecutor offered to provide further authority. The prosecutor further represented that it did not intend to argue that, because Mr. Lopez "was abused as a child, ... he probably abused [CS]." Rather, the prosecutor proposed to use Mr. Lopez's statement so that the jury could be informed as to the "honest and true answer that Mr. Lopez gave to Detective Bilkie when asked the questions." The prosecutor's position was the Mr. Lopez's answers to Detective Bilkie's questions were not a denial of having sexually abused CS but were "a nondenial at best and ambiguous."

[¶ 47] The court persisted in its view that a statement covered by W.R.E. 801(d)(2) must be against the declarant's interest and stated that "the reference to his own abuse may need to be redacted. We'll have to look at some cases on that." Finally, without ruling further, the court directed that the hearing proceed to the next motion. The court did not enter a written order embodying its ruling on this motion in limine.

[¶ 48] At trial, during the prosecutor's case and immediately before the testimony of Detective Bilkie, the prosecutor presented authority to constitute an admission against his interest in order to be admissible under W.R.E. 801(d)(2), citing 4 Mueller and Kirkpatrick, *Federal Evidence* § 411 (2d ed.1994). Mr. Lopez's counsel responded that Mr. Lopez never admitted guilt. The court observed that the probative value of Mr. Lopez's statement was "dubious from—especially from the State's point of view." However, the court went on: "To the extent that it corroborates some of the alleged victim's testimony, I still think that it's an admission to that extent, but I feel inclined to change the ruling on the inadmissibility of his statement of his own sexual abuse."

[¶ 49] During the subsequent direct examination of Detective Bilkie, the prosecutor questioned him regarding Mr. Lopez's interview at the police department on March 7, 2001, but did not refer to Mr. Lopez's assertion, made at that time, that he had been sexually abused when he was a child. When the prosecutor offered the audio tape of the interview and the transcription of the audio tape into evidence, the court sustained Mr. Lopez's objection.

[¶ 50] During cross-examination of Detective Bilkie, Mr. Lopez's counsel questioned him as to the details of Mr. Lopez's statements during the interview. The prosecutor asked for a bench conference, at which he asserted that the answers given by Mr. Lopez to Detective Bilkie's questions should be given in their entirety. Mr. Lopez's counsel responded, in essence, that she was only using selective portions of Mr. Lopez's statement and was not opening the door to the entire statement. The trial court responded, "Well, I think we're about 100th of an inch

making this entire thing admissible." Mr. Lopez's counsel responded that she would "just rephrase how I'm doing it."

[¶ 51] The defense called Mr. Lopez as its first and only witness. During direct examination, Mr. Lopez admitted that on the occasion in question he had wrestled with CS and had tickled her feet and knees but denied that he had tickled her private area. The direct examination concluded:

Q. You went and talked to Detective Bilkie at some point?

A. Yes, I did.

Q. You didn't have to go?

A. No.

Q. Why did you go?

A. Because he asked me to come down and make a statement, and tell me what the allegations were because, at that time, I didn't know. I said, "Yeah," I'd come down.

Q. You told him that you didn't tickle her in her private area?

A. That's right.

* * * *

Q. You told the detective you didn't do it?

A. Yes, I did tell him.

Q. And it wasn't good enough?

A. No.

Q. And you still ended up getting charged?

A. Yes, I did.

Q. Afraid of being convicted for something you didn't do?

A. Exactly.

Q. You didn't do this, did you?

A. No, I did not do this.

[¶ 52] On cross-examination, the prosecutor inquired into Mr. Lopez's statement to Detective Bilkie:

Q. And in fact, when you were first asked whether or not you could have accidentally inadvertently tickled her somewhere else where she may have construed it as something sexual where you didn't actually mean it to be, you did not deny touching [CS] in response to that question, did you?

A. I believe I did.

Q. Would you like to read your answer?

A. Please.

Q. Again, I'd be happy to play the tape.

A. Just say the answer. Avoid all that stuff, all that wasted time.

Q. At the top, the highlighted portion, Detective Bilkie's question, you don't say, "I didn't do it," did you?

A. In a roundabout way, yes I did.

[Prosecutor]: Your Honor, at this point in time, I think the defendant could read his answer that he gave to Detective Bilkie into the record.

Mr. Lopez's counsel objected that Mr. Lopez had answered the question by saying he did not do it, and that this was an accurate characterization of what Mr. Lopez had stated to Detective Bilkie. The prosecutor responded that Mr. Lopez's statement to Detective Bilkie was not a flat denial, as he had characterized it. Mr. Lopez's counsel countered that "the State has been told that they can't go into this, and they're using cross-examination trying to goad the defendant into saying something so they can get around a court order;" that "the State is inappropriately using cross-examination to get him to open the door so they can bypass the Court's order." The prosecutor rejoined that Mr. Lopez's counsel had opened the door on her direct examination of Mr. Lopez by eliciting his answer that he had said he didn't do it.

[¶ 53] The court ruled that the prosecutor had been "prohibited from offering this in its case-in-chief. The State complied with that. We've gotten to the point now in the state of the record where on cross-examination I just think it's admissible." Mr. Lopez's objection to the prosecutor's cross-examination was overruled.

[¶ 54] The prosecutor resumed cross-examination of Mr. Lopez:

Q .... turning again to Page 17 of the transcript of your interview with Detective Bilkie, would you please read Detective Bilkie's question to you?

A. "Was there a chance in all of this where she's kicking and moving around, and you're tickling her that maybe you accidentally or inadvertently tickled her somewhere else where—where she may

have construed it as something sexual where you didn't actually mean to do it?" "To be honest"—this is my statement— "To be honest with you, I'll—I'll tell you right now, like I said, I've been abused physically, sexually, psychologically through most of my childhood." Right there, you're just turning my words around right there.

Mr. Lopez acknowledged that this was his answer to Detective Bilkie's question. The prosecutor's cross-examination of Mr. Lopez continued with questions asking him about the details of what happened on February 17 and 18, 2001.

[¶ 55] On redirect examination, Mr. Lopez's counsel asked Mr. Lopez to read an additional portion of his statement to Detective Bilkie which immediately followed that part about which Mr. Lopez had testified on cross-examination. After repeating his statement that he had been "abused physically, sexually, psychologically through most of [his] childhood," Mr. Lopez added:

Mr. Bilkie, "Okay."

This is me, "When I wrestle with these kids I make sure my hands never go around those areas."

Mr. Bilkie: "Of course. Of course."

At the end of Mr. Lopez's redirect examination, the defense rested. The prosecutor asked that Mr. Lopez's entire statement be played for the jury. The court ruled that the jury would be given the transcript of Mr. Lopez's statement to Detective Bilkie, and admitted State's Exhibit 7 into evidence.

*Standard of Review*

[¶ 56] Where a claim of prosecutorial misconduct is made, the entire record must be considered. The basic inquiry is whether misconduct by the State has so seriously prejudiced the defendant's case that a fair trial has been denied. *Metzger v. State,* 4 P.3d 901, 910 (Wyo.2000). As recognized in *Simmons v. State,* 2003 WY 84, ¶ 15, 72 P.3d 803, ¶ 15 (Wyo.2003), when prosecutorial misconduct has been found, this Court focuses on whether the substantial rights of the accused have been adversely affected. This involves a determination of whether, "based on the entire record, a reasonable possibility

exists that, in the absence of the error, the verdict might have been more favorable to the accused." *Id.* (quoting *Earll v. State,* 2001 WY 66, ¶ 9, 29 P.3d 787, ¶ 9 (Wyo. 2001)). *See also Williams v. State,* 2002 WY 136, ¶ 21, 54 P.3d 248, ¶ 21 (Wyo.2002).

[¶ 57] The first question that must be decided when there is an allegation of prosecutorial misconduct is whether the prosecutor acted improperly. Only if that is found is it necessary to examine whether the accused's substantial rights were affected.

[¶ 58] As to Mr. Lopez's claim that the trial court improperly admitted into evidence his statement to a police detective that he was abused as a child, the standard of review examines whether the court abused its discretion.

Rulings on the admissibility of evidence are within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of a clear abuse of discretion. We will not overturn a trial court's discretionary decision unless the court acted in a manner exceeding the bounds of reason and could not rationally conclude as it did. Decisions of the trial court with respect to the admissibility of evidence are entitled to considerable deference and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be reversed on appeal. It is also well settled that a district court judgment may be affirmed on any proper legal grounds supported by the record.

*Billingsley v. State,* 2003 WY 61, ¶ 9, 69 P.3d 390, ¶ 9 (Wyo.2003) (citations omitted).

*Discussion*

[¶ 59] In light of the specific facts framing this issue, we hold that the prosecutor did not commit prosecutorial misconduct as Mr. Lopez contends. The prosecutor obeyed the trial court's order that, in its case-in-chief, the prosecutor not refer to that portion of Mr. Lopez's statement that he had been physically, sexually and psychologically abused as a child. This was specifically recognized by the court. During the defense case, in the direct examination of Mr. Lopez by his counsel, the claim was made

that Mr. Lopez had denied to Detective Bilkie that he had inappropriately touched CS. The prosecutor's position was that this direct examination had opened the door to cross-examination on the full content of Mr. Lopez's statement to Detective Bilkie. The trial court agreed with the prosecutor's position and permitted the cross-examination of Mr. Lopez about the details of his statement, and ultimately permitted the jury to have the transcript of the statement.

[¶ 60] The assertions of Mr. Lopez's counsel before the trial court that the prosecutor was acting "to goad the defendant into saying something so they can get around a court order," and that the prosecutor was "using cross-examination to get Mr. Lopez to open the door so they can by bypass the Court's order," were without merit. The identical arguments before this Court are likewise without merit. There was no prosecutorial misconduct.

[¶ 61] Mr. Lopez also asserts that the trial court "erred when it changed its evidentiary ruling following the prosecutor's manipulation of the record." However, Mr. Lopez does not present us with any analysis or authority which would support this contention. Moreover, this contention is without merit. The trial court properly admitted evidence of that part of Mr. Lopez's statement in which he asserted that he had been abused as a child, which properly permitted the jury to evaluate Mr. Lopez's full statement to Detective Bilkie.

[¶ 62] The trial court did not "change its evidentiary ruling." The court ruled at the motions hearing that Mr. Lopez's "reference to having been abused himself I think would not be admissible by the State." The court reasonably construed this to mean that the prosecutor would not be permitted in his case-in-chief to offer that portion of Mr. Lopez's statement that he had been abused as a child. There was no "change" in this ruling. The prosecutor made no reference to this evidence in his case-in-chief.

[¶ 63] The trial court's evidentiary ruling has not been shown to be in error. The trial court's action was fully consistent with the principles underlying W.R.E. 106:

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

This is characterized as the "rule of completeness." *See e.g.,* 1 *McCormick on Evidence* § 56, 248–52 (John W. Strong 5th ed.1999). In *Hayes v. State,* 935 P.2d 700, 706 (Wyo.1997), this Court stated:

We see no abuse of discretion in allowing the State to present a more complete and accurate picture of the police report once the defense opened the door and presented a partial and selective picture of what was in the report.

[¶ 64] Given the dispute regarding what Mr. Lopez had actually said in his statement to Detective Bilkie, the trial court did not abuse its discretion in permitting the jury to have the entire statement to consider. The State points out that although Mr. Lopez could have requested a limiting instruction directing the jury to restrict its consideration of the evidence to the question of whether Mr. Lopez's statement actually constituted a denial that he touched CS in appropriately, under W.R.E. 105, the record does not show that he did so.

[¶ 65] Finally, Mr. Lopez suggests that he was denied a fair trial because the admission of his statement that he was abused as a child played to "the general belief that people who are abused as kids are more likely to become abusers." The State notes that this claim is at odds with the record and the claim made earlier in Paragraph 3 of Mr. Lopez's motion in limine, which sought to exclude evidence of Mr. Lopez's statement that he had been abused as a child. Paragraph 3 declared that "there is no scientific proof" to support the belief that those who have been abused are likely to abuse other. Moreover, Mr. Lopez points to nothing in the record indicating the existence of "general belief that people who are abused as kids are more likely to become abusers." Thus, he offers neither a scientific nor an unscientific basis for his speculation as to how the challenged evidence might have af-

fected his jury. On this point, we observe that the trial court expressed its uncertainty whether evidence of childhood abuse would assist or prejudice Mr. Lopez: "It occurred to me that it would be something that might tend to evoke sympathy for Mr. Lopez by the way of exculpation, explanation, and so forth. It just seems to me like it could cut both ways." The record does not establish that the trial court was wrong or unreasonable in its belief.

[¶ 66]   Reversed and remanded for a new trial.